Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
Ryan A. Witthans (301432)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Tel. (415) 421-2624
Fax (415) 398-2820
sfinestone@fhlawllp.com

Attorneys for Debtor
Munchery, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>MUNCHERY, INC.<br><br>Debtor. | Case No. 19-30232<br><br>Chapter 11<br><br>**DECLARATON OF JAMES BERIKER IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**<br><br>**Date:** TBD<br>**Time:** TBD<br>**Place:** 450 Golden Gate Ave, 16th Floor<br>San Francisco, CA 94102 |

I, James Beriker, declare as follows:

1. I am the current Chief Executive Officer ("CEO") and sole member of the Board of Directors of Munchery, Inc. ("Munchery" or the "Debtor"). I make this declaration in support of Munchery's first day motions, including those to establish bid procedures for the sale of its assets, for approval of a stipulation for use of cash collateral and debtor-in-possession financing, approval my ongoing employment and compensation agreement with Munchery, and such additional motions as Debtor may choose to add.

2. I joined Munchery as its CEO and a member of its Board of Directors on November 11, 2016. Prior to that, I held CEO and Board positions at numerous technology startup companies in Southern and Northern California.

BERIKER DEC RE FIRST DAY MOTIONS 1

## THE CHAPTER 11 FILING

3. On February 28, 2019 (the "Petition Date"), (the "Petition Date"), Munchery filed a voluntary petition with this Court under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-referenced bankruptcy case (the "Case"). Debtor continues to manage and operate its business as a debtor in possession. No trustee or examiner has been appointed in this chapter 11 case and no committee has been appointed or designated.

## THE HISTORY OF DEBTOR AND ITS OPERATIONS

4. Munchery was founded in 2011 by Tri Tran ("Tran") and Conrad Chu ("Chu"). The business of the company was to make, sell and deliver freshly prepared meals, cooking kits, sides, desserts, and drinks to consumers. It did so through a local business, where orders placed through the company's site or mobile apps were made and fulfilled on the same day by local delivery, and a meal kit subscription business in which customers were shipped weekly kits with recipes and ingredients to prepare meals at home.

5. The original strategy for the business was to create a platform that enabled local professional chefs to make fresh meals at Munchery kitchens and to sell their products directly to customers through the Munchery website and mobile apps. The chef partners would be responsible for setting their menus, preparing their meals, and paying their own labor costs. Munchery would pay for all the costs of operating the kitchens, the cost of ingredients and other supplies, marketing the service, taking orders through its website and mobile apps and delivering to consumers-- and would share the revenue with its chef partners. The model later changed from this "marketplace" of chefs and consumers to a fully-integrated service in which Munchery eliminated the partnerships with local professional chefs and, instead, prepared, sold and delivered meals directly to customers. The meal kit business was launched in 2015 as part of the company's growth strategy.

6. The team's early focus was to develop a proprietary technology platform to operate and optimize the entire process of making and delivering fresh food to customers. The technology developed and deployed by the company included: a front-end ecommerce platform, which allowed the company to post items daily and consumers to select, purchase and pay for meals through the company's website and native apps; the production enterprise resource management ("ERP") system, which enabled the company to develop and launch new recipes, manage the supply chain for fresh ingredients and supplies, produce the meals through batch cooking, and plate individual meals; the logistics and last-mile platform, which enabled the company to accurately and quickly pack-and-pack individual items and assemble orders using modified hand scanners, distribute orders via a hub-and-spoke system where refrigerated trucks would transport orders to specific zones and hand-off the orders to the assigned drivers; and, a driver app that assisted in managing and routing orders to arrive in the windows specified by customers. All of this was managed through a set of proprietary tracking and administrative tools used by the teams to monitor and mitigate operational issues—and connected to a customer relationship management platform. The team later developed algorithms to optimize the various aspects of the service to scale operations, increase efficiency, and improve the quality of the service. In addition, the company developed over three thousand meal recipes, including descriptions, nutritional information, and photographs. Over the life of the business, the company invested significantly in its technology capabilities, believing that the company's ability to efficiently scale its operations leveraging technology would be a competitive advantage in the food delivery market.

7. Munchery launched its service in private beta in San Francisco in March 2011 and then launched to the public in May 2011. The company expanded its service to Seattle in July 2014, New York in March 2015, and Los Angeles in May 2015.

8. Munchery was targeting and providing meal preparation and delivery services for the growing market of professionals and families that were cooking less and needed alternatives to fast food and restaurant delivery—and were increasingly relying on on-demand services to fulfill their daily needs, from transportation to grocery delivery and other services.

9. When Munchery launched, food delivery was in its early stages, with local restaurant delivery becoming more accessible through marketplaces like Grub Hub, Seamless, Door Dash, Postmates, Caviar, and Uber Eats. Additionally, boxes including a recipe and pre-portioned ingredients to prepare a meal at home ("meal kits") were introduced by subscription-based services like Blue Apron, Plated, Hello Fresh, and SunBasket. As of Munchery's founding, there had been little to no investment from larger incumbent grocery companies or other ecommerce or on demand businesses, but the market for such services was growing significantly and attracting the interest of large companies and high profile institutional investors, largely based on the early success of Uber.

10. Between 2013 and 2015, the company raised $120.7 million in three preferred equity financing rounds: Series "A" of $4.3 million in 2013; Series "B" of $28 million in 2014; and, Series "C" of $88.4 million in 2015. Participants in these rounds included Menlo Ventures, Sherpa Capital and E-Ventures. In addition, Munchery secured $11.8 million in venture debt financing, including a secured term loan of $8.4 million from Comerica Bank ("Comerica") in December 2014 (the "Comerica Debt") and a secured growth capital loan of $3.4 million from TriplePoint Venture Growth BDC Corp ("TriplePoint") in June 2016 (the "TriplePoint Debt") (Comerica and Triple Point are referred to together as the "Senior Secured Creditors"). The TriplePoint Debt was subordinated to the Comerica Debt.

11. When I joined the company in November 2016, I saw significant opportunity in the market and appreciated the company's integrated approach to delivering on the value proposition to customers of accessing healthier, fresh prepared meals delivered to their homes. I believed that the market for such services was significant and that operating the whole value chain-- from direct sales to customers, through managing the supply chain, producing meals and delivering meals, all utilizing the company's own employees-- provided Munchery with the unique opportunity to deliver a high-quality product and customer experience while driving down costs and improving margins across all the business activities of the company. I believed that the quality of the technology platform that Munchery had developed would provide the company with a strong competitive advantage over other, smaller companies that did not have

the resources to invest in technology and that with the right strategy, team, focus on disciplined execution, and adequate financing from our investors, that Munchery could reverse its financial profile and build a long-term sustainable business that could both grow and be profitable.

12. The Board's priorities were aligned with mine when I joined. Our goals for 2017 and 2018 were to improve the overall quality of the service in order to improve customer retention and engagement, bring efficiencies to operations in order to reduce costs and increase gross margins, reduce the company's cash consumption to increase its runway—and ultimately raise additional capital and return to growing the business.

13. After developing a strategy and operating plan that was approved by the Board, our first action was to significantly reduce the cost of the headquarters operation. We had approximately 80 people working across finance, accounting, people operations, business development, product and engineering, culinary development, and marketing. In mid-January 2017, we completed a lay-off, reducing the number of employees in our San Francisco headquarters to less than 50 people. Our objective was to continue to invest in and resource functions that were essential to enhancing the quality of our service, provide the necessary business support functions, significantly reduce our marketing spend, and decrease overall operating expenses.

14. At the end of January 2017, both Tran and Chu resigned and left the company.

15. Early in 2017, we hired additional senior people who had experience in managing large food production operations and facilities. With their help, we streamlined our operations at each of our four markets by reducing the size and cost of local management teams, updating all processes and systems, and integrating best practices across managing our supply chains, managing our workforce, and compressing the time between receiving raw goods from suppliers to converting those products into finished goods and delivering them to our customers. By implementing just-in-time supply chain management and just-in-time production, we were able to provide our customers with fresher products, reduce our waste, and increase our gross margins.

16. Additionally, we conducted research and analysis in early 2017 that enabled the company to better identify the profile and needs of our core customers, specifically those customers that used our service regularly. This data informed our culinary planning, technology roadmap planning, and our pricing strategy. Furthermore, the data helped us target the right new customers and focus resources on retaining and growing our existing customers, allowing us to significantly reduce our paid marketing budget.

17. As a result of our efforts in 2017, we were able to significantly improve our operating metrics, including our labor cost, food cost, food waste and gross margins—across all four markets. By the end of 2017, we had reduced EBITDA losses by 49% from 2016. While we reduced marketing spend by 59%, our revenues decreased by only 8% from 2016.

18. In addition to improving our financial operating metrics, we also significantly reduced our fixed costs, including terminating or subleasing lease agreements for non-operational or non-essential properties in each of the four markets. Over 2017, we reduced the number of active leases from 23 to 13.

19. In mid-2017, in an effort to be less reliant on revenue from our direct-to-consumer business, and given that our San Francisco and Los Angeles kitchen facilities were not operating at full capacity, we identified two potential opportunities to efficiently augment our production and increase our revenues and gross margins: (1) to produce products for third parties selling their products to consumers; and, (2) to sell our branded finished products through other retail channels.

20. In that process, we identified a large regional coffee chain that wanted to provide its customers with higher quality, healthier breakfast, lunch, and snack items. We went through a long period of development and discussions on terms and logistics with this potential partner. The plan was that Munchery would develop and deliver fresh items to its locations first in Northern California and later in Southern California. In doing so, we would leverage both our food production and logistics and delivery capabilities. However, at the end of a 9-month process, the customer decided to focus other priorities and remain with its current vendor. Had

this business been secured, it would have been a very meaningful opportunity to add a stable source of revenue and gross margins to the business.

21. Additionally, after nearly one year of development, Munchery launched its branded products at two Bay Area COSTCO locations in September 2018 and expanded to 5 more locations by the end of 2018. We paused the COSTCO program in December 2018 to reduce costs as the program had not scaled sufficiently to achieve its gross margins targets and was therefore losing money. Our intention was to relaunch the program after we had secured additional financing for the business.

22. Additionally, we launched a line of Munchery branded sandwiches, entrees, salads, and breakfast items at AMAZON GO's first location in San Francisco in October 2018 and its second location in December 2018. The AMAZON GO program was successful in terms of achieving revenue and gross margin targets— and we had planned on expanding when AMAZON GO opened additional stores in the Bay Area. We continued providing products to the two AMAZON GO stores through the week immediately prior to ceasing operations.

**FURTHER RESTRUCTURING AND EFFORTS TO SELL THE BUSINESS**

23. By the third fiscal quarter of 2017, less than one year from my joining the company, the Board decided to market the company for sale. We engaged a boutique investment banking firm based in Palo Alto in October 2017. The thesis was that we had improved the business significantly in 2017 and that it was an appropriate time to identify a strategic buyer who would invest in completing the turnaround and growing the business as part of a larger platform. As part of that process, we engaged with many potential buyers across ecommerce, food delivery, grocery, airline catering, and commercial catering and food production (the "First Sale Process"). Although the firm reached out to well over 100 potential buyers in the U.S. and abroad, and we conducted over 20 management calls and meetings, we did not receive any offers to purchase the company.

24. As part of the First Sale Process, we were introduced to a large regional grocery chain in the mid-Atlantic. Initial discussions focused on a potential acquisition of the company, but eventually led to a wide scale intellectual property license of the Munchery technology

platform (the "IP License"), the assumption of Munchery's office lease at 375 Alabama Street in San Francisco, and the hiring of a large portion of the company's engineering, culinary management and marketing teams. The transaction closed in June 2018 (the "June 2018 Transaction").

25. The company received $7.5 million in cash consideration under the terms of the June 2018 Transaction, $3.4 million of which was used to pay down the Comerica debt in exchange for Comerica's consent to the IP License. The balance was used to finance the operations of the company.

26. As a result of the June 2018 Transaction, approximately 40 people transitioned off Munchery's payroll onto the licensee's payroll, enabling Munchery to significantly reduce its headcount without costly severance payments. While having an immediate positive impact on the financial profile of the company by further reducing its operating expenses and EBITDA losses, this reduction in resources required Munchery to outsource its engineering and IT, finance and accounting, and marketing functions. This proved to take longer and be more costly than anticipated.

27. In parallel with the June 2018 Transaction, and as a result of not finding a buyer for the company through the First Sale Process, the Board decided to suspend operations outside San Francisco, announcing on May 11th, 2018 the closure of its facilities and operations in Los Angeles, Seattle, and New York (the "Munchery Closures") in order to further decrease operating expenses and EBITDA losses towards preserving capital and extending the cash runway of the company. We continued to service the Los Angeles business from San Francisco by taking daily orders from our Los Angeles based clients and fulfilling their orders from San Francisco.

28. For the three months following the Munchery Closures, the team focused on selling assets, terminating or subleasing leased properties, working with vendors who were owed money in those markets, and partnering with third parties interested in accessing our customer base. As a result of those efforts, the company generated approximately $1.6 million in proceeds, used to finance the operations of the company.

BERIKER DEC RE FIRST DAY MOTIONS 8
Case: 19-30232   Doc# 6   Filed: 02/28/19   Entered: 02/28/19 15:30:01   Page 8 of 17

29. In the third and fourth quarters of 2018, the quarters immediately following the Munchery Closures, the San Francisco business was down more than 30% year-over-year. We expected the San Francisco business to be impacted by the closures of the other three markets, but we expected that the business would recover after the summer, which was historically our slowest period-- but it did not. We underestimated the impact of the news of the closures in Los Angeles, Seattle and New York on the San Francisco business. In fact, we received feedback that there was confusion about our announcement, that customers had assumed that the company was shutting down in all markets, including San Francisco. Additionally, our original analysis concluded that we would retain approximately 50% of the Los Angeles based business but we were only able to retain approximately 25%.

30. In the third quarter of 2018, the Board again decided to market the company for sale, based on the thesis that there would be interest in the company based on the fact that the business was simplified to operating only in San Francisco, that the EBITDA losses and balance sheet had significantly improved by the actions in 2017, the decrease in headcount related to the June 2018 Transaction, and the decrease in costs related to the Munchery Closures in mid-2018. Additionally, it was believed that the IP License transaction was a strong proof point of the value of Munchery's technology platform. For this effort, the Board retained an investment banking firm based in Boston, MA with experience in the food services market (the "Second Sale Process").

31. During the Second Sale Process, the team reached out to fifty or more potential buyers, including some of the potential buyers we engaged with during the First Sale Process. Despite the improvements in the business, and despite conducting 20 or more management calls and meetings, we were again unable to find a buyer for the business.

32. In parallel with the Second Sale Process, management engaged with existing and potential new investors, including venture funds and parties that had been previously involved in acquisition discussions, on a potential new round of financing. The financing would be structured attractively, likely at a much lower valuation than the previous round and potentially

structured as a complete re-capitalization of the company in which investors would have to participate in the round or lose their equity. This process was unsuccessful.

33. From early 2017 through October 2018, the turnaround efforts and ongoing operations of the business were financed through a series of convertible bridge notes, proceeds from the June 2018 Transaction, and proceeds of the sale of certain assets following the Munchery Closures.

34. During that period, existing and several new investors participated in four convertible bridge debt financings: Spring 2017 for $12 million; Fall 2017 for $7.8 million; Winter 2018 for $1.5 million; and, $1.4 million in Spring 2018.

**THE DECISION TO CEASE OPERATIONS**

35. Up until the evening of Sunday January 21, 2019, management was negotiating with the Senior Secured Creditors and several investors to continue financing the operations of the company. We developed a strategy to recover a portion of our $8 million investment the San Francisco facility by identifying a third party to assume our lease and acquire our equipment and machinery, and use those proceeds to pay down a portion of our remaining debt to the Senior Secured Creditors and finance the business to profitability. We believed that that strategy would provide $5 million or more in cash and that, with approximately $1.5 million of that cash committed to ongoing operations, the savings in moving to a less expensive facility would significantly reduce our fixed costs and accelerate our path to profitability. We were engaged with several potential counter parties interested in the San Francisco facility in early December 2018. In early January, we received indications that several parties were working towards providing the company with a proposal. However, the company could not come to an agreement with our Senior Secured Creditors and investors to continue financing the business through a longer period of time to consummate a transaction on the San Francisco facility while the business continued to operate.

36. As a result, the Board decided to cease operations on January 22, 2019. The entire workforce of 257 employees, including full-time and part-time workers in Los Angeles and San Francisco, were laid off and were paid all accrued and unpaid wages and vacation

through the end of that business day. A small team came back onto the company's payroll on the following day to assist former employees with questions related to payroll and benefits, assist them in finding new employment with companies in the San Francisco Bay Area, inventory and secure the South San Francisco facility and the company's tangible assets, and begin the process of preparing for the bankruptcy filing.

37. Ultimately, the company suffered from a number of market and competitive forces and structural deficiencies that led to its inability to develop a long-term sustainable business that could both grow and be profitable— and led to its inability to secure additional financing from existing or new investors and its subsequent closure in January 2019.

38. First, the company expanded too aggressively in its early years. The access to significant amounts of capital from leading Silicon Valley venture capital firms at high valuations and low-cost debt from banks and venture debt firms, combined with the perception that the on-demand food delivery market was expanding quickly and would be dominated by one or two brands-- as Uber had dominated the ridesharing market-- drove the company to aggressively invest in its business ahead of having a well-established and scalable business model. This resulted in over $125 million invested between 2011 and 2016 in technology development, property leases, construction of large food production facilities, expansion into new markets, and branding, partnerships and new user acquisition. The amount of capital raised and deployed, and the long-term commitments in fixed assets, made it impossible to achieve profitability, attract capital from existing or new investors, or find a buyer for the business.

39. Second, the business model relied heavily on the ability to attract new customers, which became more and more difficult as the market evolved. The cost of acquiring new customers increased significantly as other well-financed companies, such as Blue Apron, Plated, Home Chef and Hello Fresh, deployed significant budgets on search and social media platforms and leveraged aggressive promotions in order to grow their customer base. This significantly increased the cost of new customer acquisition and impaired the efficiency of these online advertising channels. The intensity of this competition, driven by the belief that user growth was essential to raising additional financing or executing a successful initial public

offering, resulted in a deterioration of the entire market opportunity. Many companies, including Debtor, experienced a steady increase of customer-acquisition-cost, a decrease in customer retention and lifetime value, and increase in churn (or customer loss). The erosion of these fundamental operating metrics undermined the business models of many if not all startups seeking to develop long-term sustainable businesses in food delivery and impaired their ability to attract additional financing.

40. Third, as the market home delivery of prepared food expanded rapidly, particularly in the urban early-adopter markets in which Munchery operated, competition from well financed on-demand services such as Grub Hub, Seamless, Door Dash, Postmates, Caviar, and Uber Eats, increased significantly. These services were able to quickly bring popular restaurants onto their platforms, increasing choices for customers, and were able to invest heavily in brand marketing and user acquisition and drive adoption through free delivery and other incentives. The proliferation of these services made it difficult for Munchery to effectively differentiate its service and compete with their extensive meal choices, convenience and pricing.

41. Fourth, the costs associated with producing and delivering high quality meals every day, including the costs of labor, packaging, and fresh ingredients, increased beyond the company's ability to raise prices while remaining competitive, suppressing its gross margins and impeding profitability.

42. Finally, the initial public offering of Blue Apron in June 2017, and the subsequent reporting of its financial and operational metrics, particularly its cost of customer acquisition, customer lifetime value, customer churn and retention rates, its advertising and marketing costs, the capital expense requirements of its business, the cost and complexity of its business operations, and the loss of approximate nearly 70% in enterprise value in its first year as a public company, had a material negative impact on access to financing for startups in the online food delivery business.

43. Like other startups in the fresh food delivery market, including early companies such as Spoon Rocket, Sprig, Maple, Bento, that ceased operations in March 2016, May 2017,

May 2017, and January 2017, respectively, making and delivering freshly prepared food directly to consumers proved not to be a sustainable business model.

**THE COMPANY'S ASSETS AND GENERAL DEBT STRUCTURE**

44. The Debtor's assets include: the lease, improvements and equipment located at 220 Shaw Road in South San Francisco, CA (the "Premises"), which include approximately 70,000 square feet of space with approximately 35,000 square feet of built out and fully useable food preparation and storage space; and, the intangible assets, including intellectual property, customer lists, brand, recipes and other data, and tradename (collectively the "Intangible Assets"). The company also owns miscellaneous assets of relatively minor value, such as security deposits, insurance premium refunds from cancelled policies, and accounts receivable.

45. The primary liabilities of the company include:
   a. Senior Secured Debt as outline above of approximately $5.3 million;
   b. Subordinated secured debt/ convertible debt of approximately $23 million;
   c. Unsecured debt to vendors, suppliers and various counter parties of approximately $3 million;
   d. Customers who have gift cards balances of approximately $3 million.

**INITIAL ASSET SALE, FIRST DAY MOTIONS AND THE CHAPTER 11 CASE:**

46. Prior to filing the Case, Munchery entered into a Letter of Intent ("LOI") with Gate Gourmet, Inc. ("Gate"), a leading airline catering company with global operations. The LOI covers: i) the assignment of Debtor's lease for Premises; ii) payment for Debtor's improvements to the Premises; and, iii) the sale of Debtor's equipment and machinery located in the kitchen on the Premises. Munchery spent approximately $8 million in building out the Premises and acquiring machinery and equipment used in the preparation and storage of food. I believe the facility is a very attractive opportunity for companies looking to acquire a large food preparation and storage facility, given particularly the room for expansion within the Premises and its proximity to the San Francisco International Airport. Debtor anticipates having an agreed upon Asset Purchase Agreement ("APA") with Gate soon after the case is filed if it does not have one prior to filing.

47. In very general terms, the transaction with Gate provides for the payment of $5 million, plus a replacement security deposit for the landlord of $300,000 and a $300,000 letter of credit ("LOC"). The company's current LOC is secured by a pledge account held by Comerica. The provision of the security deposit and letter of credit will result in a release of like amounts back to the Debtor from the landlord and Comerica. The proposed transaction includes an additional five (5) year extension of the lease and a commitment by Gate to make at least $1 million of improvements to the Premises in the first two years of its occupancy; otherwise, the proposed terms of the lease assumption by Gate are identical to our current terms. A more thorough discussion of the LOI is found in Debtor's Motion to Establish Bidding Procedures. Debtor agreed with Gate to file this motion at the beginning of the case so procedures will be established, and the sale process can move promptly.

48. The Gate transaction will be subject to a minimum overbid of $250,000 and a breakup fee of $150,000 to be paid to Gate if it is not the successful bidder in the event of an overbid. If an overbid is timely received, any additional bids will be in minimum increments of $25,000. As Munchery was in discussions with other parties concerning the Premises and assets located there, an overbid is possible. If there is an overbid, Debtor anticipates holding an in-court auction at a hearing in early April and closing the transaction by the end of April.

49. Munchery has entered into a stipulation for use of cash collateral (the "Stipulation") with Comerica and TriplePoint and debtor in possession financing ("DIP Financing") that is designed to cover the operational costs (the largest of which is monthly rent for the Premises of $87,748). The Stipulation includes a projected budget and provides for certain carve-outs for professionals, U.S. Trustee fees, and unsecured creditors. The Stipulation and related information are discussed separately in Debtor's first day motion seeking approval of its terms.

50. I and one other Munchery employee will handle matters during the Chapter 11 case. The one other employee is knowledgeable with Munchery's previous operations, assets, finance and accounting processes and information and will be paid a salary of $19,522 per month while her services remain necessary (estimated for one month through the end of March

2019). This salary reflects a $5,000 per month increase to her pre-petition salary, which the company agreed to as an inducement for her to remain through March. I entered into a new offer letter with respect to my responsibilities and compensation in the Chapter 11 case. As all the company board members other than me had resigned from the Board of Directors by the middle of January, I disclosed my proposed compensation agreement to the investors that represented the majority of our shareholders and bridge noteholders. The agreement requires me to provide services relating to the sale of assets and representing the company and otherwise assisting counsel with the filing and consummation of the bankruptcy proceeding. Under the terms of my ongoing employment, my compensation is $18,750 per month, which is one-half of my regular pre-petition salary (anticipated for two months through April 2019). In addition, the agreement provides that I will receive a success fee based on the net proceeds recovered from the sale of the company's assets up to a maximum of $250,000. The success fee is payable on a sliding scale, in fixed increments based on the net cash available after the deduction of direct costs related to the sale of assets. More detail is available in the Stipulation. The Senior Secured Lenders have consented to the use of cash collateral to pay my compensation. Given my experience and familiarity with the company and its assets, and the market of potential buyers for the assets, and my involvement pre-petition with Gate and other parties interested in purchasing assets, it is in the Debtor's best interests for me to remain engaged in this process.

51. In addition to the anticipated sale to Gate or an overbidder, I am in the process of identifying buyers for the Intangible Assets. I believe the sale of the Intangible Assets can be done without enlisting the services of a broker or investment banker and I will continue working on the sale of these assets while the Gate transaction moves forward.

52. In regard to the motion dealing with Debtor's pre-petition bank accounts, the primary accounts are held at Comerica and subject to its control. The accounts can be identified by the last digits as follows: 4688; 4684; 4700; 4718; and 7071. Debtor proposes to have Comerica place a "hard hold" on all of its pre-petition deposit accounts but to keep the accounts open for the sole purpose of receiving payments and refunds that are sent via electronic

payment methods. Debtor will not write checks or send electronic transfers from its accounts and no pre-petition checks written on the accounts will be honored. This will avoid the problem of having any outstanding checks clear the Debtor's pre-petition accounts. Debtor will open a new operating DIP account at Comerica. Keeping the pre-petition accounts open will assist in the collection of outstanding accounts receivable and refunds. Corporate customers and credit card companies and vendors that owe the Debtor refunds, typically send electronic payments directly into Debtor's pre-petition deposit accounts and if Debtor closes the accounts, it will likely disrupt Debtor's timely receipt off such payments and refunds. As Debtor has only two employees left, and we are working on the sale process and compliance with the Debtor's bankruptcy obligations, it will be challenging to find the time to communicate with Debtor's former customers with respect to a change of bank accounts, and even after doing so, payment disruptions and delays are likely. Accordingly, Debtor requests it be permitted to retain its pre-petition accounts while placing a "hard hold" on such accounts.

53. With respect to the first day motion regarding notice, Debtor has approximately 230 creditors who are primarily vendors and counter parties and over 250 former employees, all of which will receive notice of the bankruptcy filing in the traditional method. In addition to these parties, Debtor owes approximately $3 million to thousands of its former customers (the "Customer Obligations"). The Customer Obligations are relatively small and are in the form of unused or partially used gift cards or credits. Given the number of customers who are owed money, the cost to provide written notice to these customers, and the cost of assembling the information, would be prohibitive. Moreover, Debtor only communicated with these customers via electronic communication sent by email. Accordingly, and as requested in the first day motion with respect to notice, Debtor requests that it be allowed to provide notice of the bankruptcy filing to former customers via email. Debtor has discussed a process for doing this with Omni Management, which it anticipates retaining for handling such notice and to create a website with information on the bankruptcy filing that can be easily accessed by creditors, customers and employees.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28th day of February 2019 at South San Francisco, California.

    /s/ James Beriker
    James Beriker