FINESTONE HAYES LLP
STEPHEN D. FINESTONE
Cal. Bar No. 125675
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone:      (415) 421-2624
Facsimile:      (415) 398-2820

Attorneys for Debtor and Debtor-in-Possession,
MUNCHERY INC.

SHEPPARD MULLIN RICHTER &
HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
KYLE MATHEWS
Cal. Bar No. 218384
333 South Hope Street, 43rd Floor
Los Angeles, California  90071-1448
Telephone:      213-620-1780
Facsimile:      213-620-1398

Attorneys for Secured Creditor,
COMERICA BANK

MCDERMOTT WILL & EMERY LLP
GARY B. ROSENBAUM
Cal Bar No. 134252
2049 Century Park East, 38th Floor
Los Angeles, CA 90067-3218
Telephone:      (310) 284-6133
Facsimile:      (310) 277-4730

Attorneys for Secured Creditor,
TRIPLEPOINT VENTURE GROWTH BDC
CORP.

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA

In re:

MUNCHERY INC.,

                    Debtor and Debtor-in-
                    Possession.

Case No.: 19-30232

Chapter 11

**STIPULATION REGARDING USE OF
CASH COLLATERAL, PROVISION OF
ADEQUATE PROTECTION AND
DEBTOR IN POSSESSION FINANCING**

Date:
Time:
Place:

SMRH:489200564.1

STIPULATION RE USE OF
CASH COLLATERAL AND DIP FINANCING

This Stipulation regarding Use of Cash Collateral, Provision of Adequate Protection and Debtor in Possession Financing ("Stipulation") is entered into by and between Munchery Inc., as Debtor and Debtor-in-Possession ("Debtor" or "Munchery"), Comerica Bank ("Bank"), and TriplePoint Venture Growth BDC Corp. ("TriplePoint" and together with Bank, collectively, "Senior Secured Parties").

## INTRODUCTORY STATEMENT[1]

Munchery was a startup business, founded in 2011, that specialized in the preparation and delivery of healthy and delicious meals to consumers and businesses. Overall, Munchery raised over $120 million in venture capital funding. Ultimately, Munchery was not successful. At one point Munchery operated in San Francisco, Los Angeles, Seattle and New York. However, in May 2018, Munchery closed its operations outside of San Francisco and sought to consolidate and rebuild its business around its San Francisco operations. Munchery's San Francisco operations were conducted through a large leased facility located at 220 Shaw Road, South San Francisco, CA 94080 (the "Facility"). The Facility, which is leased under that certain AIR Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease – Net, dated as of April 2015, as amended (the "Lease"), between Eureka Ventures VI, LLC, as successor to Lynne J. Bacon, Trustee of the Bacon Family Trust (the "Landlord") and Debtor, includes approximately 70,000 square feet of rental space and contains valuable improvements and equipment related to the operation of Debtor's business.

After consolidation of its business, Munchery continued to operate in the San Francisco Bay Area out of the Facility until January 2019, at which time Munchery decided to shutter its operations. Munchery's current focus is to recover value on behalf of its creditors from the following assets groups: (a) the Facility (as defined below) and certain fixtures and tangible assets located therein; (b) intangible assets, including intellectual property, customer lists, and tradename(s); and (c) net operating losses, which could be as high as $116 million.

---

[1] Background regarding the Debtor's business and its financial challenges are discussed in greater detail the *Declaration of James Beriker* filed in support of the Debtor's various first day motions.

Prior to the Debtor's bankruptcy filing, Debtor entered into a non-binding letter of intent (the "Stalking Horse LOI") with Gate Gourmet, Inc. (the "Stalking Horse") as a prospective buyer to take over the Lease and to acquire Debtor's fixtures and assets within the Facility (the "Purchased Assets"). Under the Stalking Horse LOI, the Stalking Horse proposes to pay $5,000,000 to the Debtor in exchange for the Purchased Assets and assignment of the Lease (with certain modifications agreed to between the Stalking Horse and the Landlord). Debtor and the Stalking Horse have reached an agreement regarding bid procedures with respect to the transaction, including an minimum overbid of $250,000 (the "Proposed Bid Protections"), which procedures will be the subject of a separate motion filed with the Bankruptcy Court. Upon execution of an asset purchase agreement on the terms set forth in the Stalking Horse LOI (the "Stalking Horse APA"), the Debtor will file its *Motion to Establish Bidding Procedures* seeking, *inter alia*, authorization to enter into the Stalking Horse APA and approval of the Proposed Bid Protections.

This Stipulation provides for the use of Cash Collateral (as defined below) and the Debtor-in-Possession Credit Facility (as defined below) for an eight-week period commencing on the petition date and ending on April 25, 2019. The Debtor anticipates that the agreed-to eight week period will be sufficient time to obtain approval of the Stalking Horse APA and close a sale transaction with the Stalking Horse (or any overbidder) under Bankruptcy Code section 363(b). The proceeds of a sale transaction should be sufficient to pay off Bank in full and pay off a substantial portion of the pre-petition amounts owed to TriplePoint.

## SUMMARY OF RELEVANT TERMS[2]

As set forth in greater detail below, the Debtor and Senior Secured Parties have agreed as follows:

---

[2] This section provides an overview of the relevant terms and conditions of the Stipulation and is not intended to substitute for the specific terms and conditions set forth below. In the event of a conflict between this summary and the terms and conditions of this Stipulation, the terms and conditions of the Stipulation shall control.

- The Debtor's use of Cash Collateral is governed by the Senior Secured Parties' existing loan agreements with the Debtor, subject to specific budget constraints set forth in the Approved Budget (as defined below);

- The Debtor's access to financing under the Debtor-in-Possession Credit Facility is governed by the terms of this Stipulation and evidenced by a new debtor-in-possession promissory note between Munchery and TriplePoint. The maximum principal amount of the note is $300,000, with interest accruing at a rate of 12.5 percent per annum. The maturity date of the Debtor-in-Possess Credit Facility and related promissory note is April 25, 2019;

- In consideration of the Senior Secured Parties' consent to use of Cash Collateral, the Senior Secured Parties will receive replacement liens on and security interests in all assets and other property of the Debtor's bankruptcy estate, with the same priority as their respective pre-petition liens and security interests, subject to the Carve-Out (as defined below). The Senior Secured Parties will also receive a super-priority claim to the extent permitted by Section 507(b) in the amount of any post-petition loss/diminution;

- In consideration for providing post-petition financing under the Debtor-in-Possession Credit Facility, TriplePoint will receive a priming lien on all Debtor's assets, whether part of the Debtor's estate or subsequently acquired, other than the proceeds received from any avoidance actions under Chapter 5 of the Bankruptcy Code, subject to the Carve-Out and the TriplePoint Subordination Agreement (as defined below) as such agreement is modified by the terms of this Stipulation;

- The Stipulation also provides for releases by the Debtor in favor of the Senior Secured Parties and stipulates to the validity of their loan amounts, security interests and liens subject to a challenge period for the Committee (as defined below) and other parties in interest (other than the Debtor);

- The Senior Secured Parties agree to a Carve-Out for certain administrative expenses, including expenses incurred by the Debtor's professionals, the Committee's

professionals, a fee for James Beriker (if he successfully concludes a sale of substantially all of the Debtor's assets to the Stalking Horse or an overbidder and the Debtor subsequently consummates such sale), U.S. Trustee's fees, as well as for a recovery to the Debtor's general unsecured creditors. The amount allocated to the Carve-Out is set forth in the Stipulation and varies depending on the net sale proceeds received by the Debtor in a sale of substantially all of the Debtor's assets; and

-     Finally, the Stipulation defines certain events of default and provides that the Senior Secured Parties' consent to the Debtor's use of Cash Collateral and TriplePoint's obligation to extend credit under the Debtor-in-Possession Credit Facility shall terminate immediately upon an event of default. If an event of default is not cured within five business days, the Stipulation allows the Senior Secured Parties to seek *ex parte* relief from stay based upon the declaration of its counsel or representative, while providing Debtor the opportunity to contest the existence of a default or seek continued use of Cash Collateral.

## **RECITALS**

The Debtor and Senior Secured Parties agree and stipulate as follows, with reference to the following facts:

A.     The present bankruptcy case (the "Case") was commenced on February 28, 2019 (the "Petition Date"), when Debtor filed its petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"). Debtor continues in possession of its assets, as a debtor-in-possession and continues to operate its business and no official committee of unsecured creditors or chapter 11 trustee has been appointed in this case.

B.     Bank has previously made loans (collectively, the "Bank Loans") to Debtor, which are evidenced by, and pursuant to, among other things, the Loan and Security Agreement dated as of December 18, 2014 (as has been amended, supplemented, replaced, restated or otherwise modified, the "Bank Loan Agreement", a true and correct copy of which is attached as Exhibit A) by and between Debtor and Bank. The Bank Loans and all other liabilities and obligations under

the Bank Loan Agreement and the other Bank Loan Documents (as defined below) (collectively, the "Bank Obligations") are secured by all personal property assets of Debtor pursuant to the terms of the Bank Loan Agreement and certain other Bank Loan Documents (the "Pre-Petition Bank Non-IP Collateral").  The foregoing security interest is perfected by the filing of a financial statement with the Delaware Department of State, Filing No. 20145291430 (the "Bank Financing Statement", a true and correct copy of which is attached as <u>Exhibit B</u>).

C.      Debtor and Bank entered into an Amended and Restated Prime Referenced Rate Addendum to Loan and Security Agreement dated as of April 17, 2017 (as has been amended, supplemented, replaced, restated or otherwise modified, the "Bank Interest Rate Addendum", a true and correct copy of which is attached as <u>Exhibit C</u>).

D.      Debtor and Bank entered into certain Standby Letter of Credit Applications pursuant to which Bank issued certain letters of credit and Debtor posted certain cash collateral as security for its reimbursement obligations to Bank (as have been or may be amended, supplemented, replaced, restated or otherwise modified, the "LC Application and Pledge Agreements", true and correct copies of which are attached as <u>Exhibit D</u>).  Pursuant to the LC Application and Pledge Agreements, Debtor pledged to Bank a lien on and security interest in certain blocked deposit accounts held at Bank (the "Pledged Account(s)").  As of January 21, 2019, the Pledged Account(s) held pledged funds in the amount of $329,270.37 (the "Restricted Funds").  Prior to the Petition Date, Bank consented to the use of Restricted Funds to protect and preserve the Debtor's assets.  The balance of the Pledged Account(s) as of the Petition Date is $146,522.37.

E.      The Bank Obligations are also secured by, among other things, the Debtor's intellectual property (the "Pre-Petition Bank IP Collateral" and, together with the "Pre-Petition Bank Non-IP Collateral, the Pre-Petition Bank Collateral") pursuant to the Intellectual Property Security Agreement dated as of January 31, 2017 (as has been or may be amended, supplemented, replaced, restated or otherwise modified, the "Bank IP Agreement", a true and correct copy of which is attached as <u>Exhibit E</u>, and together with the Bank Loan Agreement and the Bank Pledge

Agreements, collectively the "Bank Collateral Documents") by and between Debtor and Bank.

F.     The Bank Collateral Documents, the Bank Interest Rate Addendum, all amendments, modifications or supplements to any of the foregoing, this Stipulation, and all other documents executed in connection with the Bank Loan Agreement or this Stipulation, are hereinafter referred to collectively as the "Bank Loan Documents".

G.     TriplePoint has previously made loans (collectively, the "TriplePoint Loans") to Debtor, which are evidenced by, and pursuant to, among other things, the Plain English Growth Capital Loan and Security Agreement dated as of June 30, 2016 (as has been amended, supplemented, replaced, restated or otherwise modified, the "TriplePoint Loan Agreement", a true and correct copy of which is attached as Exhibit F) by and between Debtor and TriplePoint. The TriplePoint Loans and all other liabilities and obligations under the TriplePoint Loan Agreement and the other TriplePoint Loan Documents (as defined below) (collectively, the "TriplePoint Obligations" and, together with the Bank Obligations, the "Pre-Petition Obligations") are secured by all personal property assets of Debtor pursuant to the terms of the TriplePoint Loan Agreement and certain other TriplePoint Loan Documents defined below (the "Pre-Petition TriplePoint Non-IP Collateral").  The foregoing security interest is perfected by the filing of a financial statement with the Delaware Department of State, Filing No. 20163952395 (the "TriplePoint Financing Statement", a true and correct copy of which is attached as Exhibit G).  TriplePoint's security interests are subordinate to those of the Bank on the terms and conditions set forth in the TriplePoint Subordination Agreement (as defined below).

H.     The TriplePoint Obligations are also secured by, among other things, the Debtor's intellectual property (the "Pre-Petition TriplePoint IP Collateral", together with the Pre-Petition TriplePoint Non-IP Collateral, the "Pre-Petition TriplePoint Collateral" and, together with the Pre-Petition Bank Collateral, the "Pre-Petition Collateral") pursuant to the Plain English Intellectual Property Security Agreement dated as of June 30, 2016 (as has been or may be amended, supplemented, replaced, restated or otherwise modified, the "TriplePoint IP Agreement", a true and correct copy of which is attached as Exhibit H, and together with the TriplePoint Loan

SMRH:489200594.1
Case: 19-30232    Doc# 9    Filed: 02/28/19    Entered: 02/28/19 16:11:20    Page 7 of 30

Agreement, the "TriplePoint Collateral Documents") by and between Debtor and TriplePoint.

I.      The TriplePoint Collateral Documents, all amendments, modifications or supplements to any of the foregoing, this Stipulation, and all other documents executed in connection with the TriplePoint Loan Agreement or this Stipulation, are hereinafter referred to collectively as the "TriplePoint Loan Documents" and, together with the Bank Loan Documents, as the "Pre-Petition Loan Documents".

J.      All present and future indebtedness of Debtor to, and any and all present and future liens on and security interests in any present and future assets of Debtor in favor of the Subordinated Creditors (defined below), respectively, were subordinated to the Bank Obligations and to any and all present and future liens on and security interests in any and all present and future assets of Debtor in favor of Bank, by the following respective Subordination Agreements (as have been or may be amended, supplemented, replaced, restated or otherwise modified, the "Subordination Agreements", true and correct copies of which are attached as Exhibit I):

1.   The Subordination Agreement, dated as of June 30, 2016 between TriplePoint and Bank (the "TriplePoint Subordination Agreement");

2.   The Subordination Agreement, dated as of February 15, 2017, among Sherpa Ventures Fund, LP, SherpaEverest Fund, LP, Menlo Ventures XI, L.P., MMEF XI, L.P., Menlo Ventures XII, L.P., Menlo Entrepreneurs Fund XII, L.P., MMEF XII, L.P., BV eVenture Fund II, LP (collectively, the "Sherpa Subordinated Creditors") and Bank;

3.   The Subordination Agreement, dated as of February 15, 2017, among the Sherpa Subordinated Creditors and TriplePoint;

4.   The Subordination Agreement dated as of October 2, 2017, among COTA Capital Master Fund, L.P., OA3, LLC, and certain other subordinated creditors signatory thereto (collectively, the "COTA Subordinated Creditors"), Sherpa Subordinated Creditors and Bank;

5.   The Subordination Agreement dated as of October 2, 2017, among the COTA Subordinated Creditors, the Sherpa Subordinated Creditors and TriplePoint;

6.   The Subordination Agreement, dated as of January 25, 2018, among the Simkin Living Trust 5-1-2017, RDG Inc., the Baldwin Family Trust dated 9-16-15, the Lezack Living Trust, Smokey Investments LP, IPV SS II LLC, Jordan Simkin, Gayl Simkin, Nathan Fields, Murray Simkin and VIVE VC Fund, L.P. collectively, the "VIVE Subordinated Creditors" and together with TriplePoint, the Sherpa Subordinated Creditors and the COTA Subordinated Creditors, collectively the "Subordinated Creditors") and Bank; and

7.   The Subordination Agreement, dated as of January 25, 2018, among the VIVE Subordinated Creditors and TriplePoint.

K.   The provisions of the TriplePoint Subordination Agreement will be modified by this Stipulation.  Except as expressly amended hereby, all Subordination Agreements shall remain in full force and effect.

L.   Certain Events of Default occurred under the terms of the Pre-Petition Loan Documents in May 2018.

M.   Bank and Debtor entered into a Forbearance Agreement ("Forbearance Agreement") as of May 24, 2018.  A true and correct copy of the Forbearance Agreement is attached as Exhibit J.

N.   All of Debtor's liquid assets at the time of Debtor's bankruptcy filing and wherever located now are the cash collateral of Senior Secured Parties (the "Cash Collateral") pursuant to Section 363 of the Bankruptcy Code.  This Stipulation is intended to authorize the Debtor to: (i) use any Restricted Funds and any other funds that are in the Pledged Account(s) as of the Petition Date; (ii) obtain post-petition financing from TriplePoint in the amount of up to $300,000 pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code (the "Debtor-In-Possession Credit Facility"); and (iii) use the Senior Secured Parties' Cash Collateral through the end of the Budget Period (described below), while providing adequate protection of the Senior Secured Parties' interests therein pursuant to Section 361 and 363 of the Bankruptcy Code.

O.       The Debtor requires post-petition financing and requires the continued use of Cash Collateral in order to maintain the value of the Debtor's assets.  Subject to Court approval of this Stipulation, TriplePoint is willing to provide post-petition financing and the Senior Secured Parties are willing to permit Debtor to use Cash Collateral for up to eight (8) weeks beginning on the Petition Date and continuing through April 25, 2019 (the "Budget Period") upon the terms and conditions as provided for herein and upon the provision of adequate protection under Section 361 of the Bankruptcy Code.  Accordingly, the Debtor and Senior Secured Parties seek authority to establish a basis upon which the Debtor may borrow up to $300,000 under the Debtor-in-Possession Credit Facility and use Cash Collateral in accordance with the terms set forth herein and to provide for the adequate protection of the security interests of each of the Secured Parties in the collateral utilized by the Debtors.

P.       In order to provide Senior Secured Parties with adequate protection from any loss, decrease, diminution or decline in the value of Senior Secured Parties' interest in its Pre-Petition Collateral caused or resulting from the use, sale or lease thereof by Debtor in accordance with Section 363(e) of the Bankruptcy Code, or from the consequences of the automatic stay imposed by Section 362 of the Bankruptcy Code ("Post-Petition Loss"), the Senior Secured Parties are entitled to adequate protection under Sections 361 and 363(e) of the Bankruptcy Code in the form of replacement liens on and security interests in all assets and other property of Debtor with the same priority as Senior Secured Parties' prepetition liens on and security interests in the Pre-Petition Collateral (subject to the modifications of the TriplePoint Subordination Agreement contained herein), cash payments and other protections contained in this Stipulation, as well as a super-priority administrative claim under Section 507(b), subject to the limitations set forth herein.

## **AGREEMENT**

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED as follows:

1.  <u>Acknowledgement of Pre-Petition Loan Documents</u>.  Debtor has reviewed the Pre-Petition Loan Documents in light of the circumstances surrounding Secured Parties' pre-petition financing

Case: 19-30232   Doc# 9   Filed: 02/28/19   Entered: 02/28/19 16:11:20   Page 10 of 30

of Debtor.  Based upon that review and subject to the rights of other parties in interest to object as provided below, Debtor hereby stipulates, for itself and only for itself, that:

    a.  The Bank Loan Documents are valid and enforceable agreements in accordance with their terms;

    b.  The TriplePoint Loan Documents are valid and enforceable agreements in accordance with their terms;

    c.  As of the Petition Date, the Bank Obligations consisted of $2,045,376.98 (including $1,925,048.16 with respect to the principal balance of the Bank Loans, $29,664.46 accrued interest, $8,531.36 in late fees, and $82,133.00 in pre-petition attorneys; fees and costs) plus reimbursement obligations with respect to outstanding letters of in the face amount of $300,000.

    d.  As of the Petition Date, the TriplePoint Obligations consisted of $3,410,120.44 ($3,147,620.44 with respect to the principal balance of the TriplePoint Loans, plus $262,500 end of term payment) plus accrued and unpaid interest and any pre-petition costs, expenses or attorneys' fees incurred by TriplePoint that are recoverable under the terms of the TriplePoint Loan Documents.

    e.  The Bank Obligations are the valid, enforceable, allowable and unavoidable obligations of Debtor; the Obligations are not subject to claims of subordination or recharacterization (other than as expressly set forth in this Stipulation); there are no claims, set-offs or defenses to the Obligations; and the Obligations are now due and owing;

    f.  The TriplePoint Obligations are the valid, enforceable, allowable and unavoidable obligations of Debtor; the Obligations are not subject to claims of subordination or recharacterization (other than as expressly set forth in this Stipulation); there are no claims, set-offs or defenses to the Obligations; and the Obligations are now due and owing;

g. Bank's lien on, and security interest in, the Pre-Petition Collateral is valid, unavoidable, perfected and is first in priority.

h. TriplePoint's lien on, and security interest in, the Pre-Petition Collateral is valid, unavoidable, perfected and is first in priority (subject only to Bank's lien on, and security interest in, such Pre-Petition Collateral).

2. <u>Objection by Parties in Interest</u>. No later than 60 days after the appointment of an Unsecured Creditors Committee (the "Committee") in the Case, or if no Committee is appointed, 90 days from entry of the Interim Order (defined below) approving this Stipulation (the "Challenge Period"), any party in interest with standing to appear in this Case (other than the parties hereto) may file and serve upon the Debtor and the Senior Secured Parties any objection to the Pre-Petition Obligations or to either Senior Secured Party's lien on and security interest in the Pre-Petition Collateral as set forth above. If no objections are timely filed and served within the Challenge Period, the Pre-Petition Obligations shall be deemed valid, enforceable, allowable and unavoidable, and not subject to subordination or recharacterization, and Senior Secured Parties' liens on and security interests in the Pre-Petition Collateral shall be deemed valid, enforceable, unavoidable, perfected and first in priority. In addition, the claim of Bank shall be deemed allowed in an amount of not less than $2,045,376.98 (the "Bank Claim Amount") and the claim of TriplePoint will be deemed allowed in the amount of not less than $3,410,120.44 (the "TriplePoint Claim Amount"), with no right to seek reconsideration of such allowance.

3. <u>Release of Senior Secured Parties</u>. Debtor is aware of no grounds and does not assert any pre-petition claims or causes of action against Senior Secured Parties. In consideration for the accommodations provided hereunder, but subject to the rights of other parties in interest to object to the Pre-Petition Obligations or to each Senior Secured Party's respective lien on and security interest in the Pre-Petition Collateral as provided above, Debtor, individually and on behalf of its attorneys, accountants, consultants, agents, servants, members, officers, directors, shareholders, employees, predecessors, parents, subsidiaries, affiliates, successors and assigns, and all persons acting by, through, under, or in concert with any of them (in their representative capacities, the

SMRH:489280504.1

foregoing individuals and entities herein referred to as the "Releasors"), hereby irrevocably and unconditionally releases and forever discharges Bank, TriplePoint, and each of their respective attorneys, accountants, consultants, agents, servants, members, officers, directors, shareholders, employees, predecessors, parents, subsidiaries, affiliates, successors and assigns, and all persons acting by, through, under, or in concert with any of them (the foregoing individuals and entities herein referred to as the "Releasees") from any and all charges, complaints, claims, and liabilities of any kind which the Releasors, as of the Petition Date, currently have (whether known or unknown) against any one or more of the Releasees, including, without limitation, claims for the recovery of preferential transfers, fraudulent conveyances, or other avoidance actions under federal or state law, including all attorneys' fees, interest, expenses, and costs actually incurred or of any nature whatsoever, known or unknown, suspected or unsuspected, which in any way arise from or relate to the Pre-Petition Loan Documents or the Pre-Petition Obligations. Debtor agrees that Bank's claim as to Bank Obligations is allowed in an amount of not less than the Bank Claim Amount and that TriplePoint's claim as to the TriplePoint Obligations is allowed in an amount of not less than the TriplePoint Claim Amount, and Debtor waives any right to seek reconsideration of such allowance of claim. Debtor further waives any right to seek to surcharge the Senior Secured Parties' collateral under Section 506(c) of the Bankruptcy Code or under any other legal or equitable basis, including any "equities of the case" claims under Section 552(b) of the Bankruptcy Code.

4. <u>General Release</u>. To the extent that the releases contained in the foregoing Section 3 are releases to which Section 1542 of the California Civil Code or similar provisions of other applicable law apply, Debtor specifically waives any and all rights and benefits conferred upon it thereby. Section 1542 provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE**

**AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

The Debtor, on behalf of itself and the Releasors, expressly waives and releases any right of benefit which it or they might now of in the future have under California Civil Code Section 1542 (or any other laws of similar effect) to the fullest extent that such rights or benefits may be lawfully waived and released. The Debtor, on behalf of itself and the Releasors, acknowledges that it may hereafter discover facts different from the facts now known or believed by the Debtor and/or the Releasors to be true with respect to the matters covered by this release, and agrees that this release nevertheless will be binding on the Debtor and the Releasors and remain in full force and effect. Notwithstanding the foregoing, this Section 4 shall not affect the rights of other parties in interest to object to the Pre-Petition Obligations or to each of the Senior Secured Party's liens on and security interests in the Pre-Petition Collateral in accordance with the terms and conditions set forth in Section 2 of this Stipulation.

5. <u>Use of Cash Collateral</u>. Subject to the terms and conditions of this Stipulation, the Senior Secured Parties hereby consent to Debtor's use of Cash Collateral during the Budget Period, and Debtor is hereby authorized to use Cash Collateral in accordance with the following procedures:

      a. <u>Approved Budget</u>. Debtor may utilize cash collateral only for the purpose of paying the projected expenses of its post-petition operations, the costs of operating their bankruptcy estates, the fees and expenses of the professionals employed by Debtor and the fees owing to the Office of the United States Trustee and the Clerk of the Bankruptcy Court, all as set forth in their budget, a true and correct copy of which is attached hereto as <u>Exhibit K</u> and its terms are incorporated herein in full by this reference (as the same may be amended from time to time in writing and approved by each Senior Secured Party and Debtor, the "Approved Budget"). The Approved Budget specifies, on a weekly basis, by amount, type and kind, all expenses anticipated by Debtor for the Budget Period. Upon expiration of the

Budget Period, (i) TriplePoint's agreement to make advances under the Debtor-in-Possession Credit Facility and the Senior Secured Parties' consent to the Debtor's use of Cash Collateral shall automatically terminate, (ii) the Debtor shall immediately cease its use of Cash Collateral, unless the Budget Period is extended by further stipulation of each Senior Secured Party and Debtor, or such continued use of Cash Collateral is authorized by the Court, and (iii) the DIP Loans and the amount of the Restricted Funds actually used by the Debtor shall become immediately due and payable without notice or demand. Debtor reserves all rights to seek approval of their continued use of Cash Collateral beyond the expiration of the Budget Period, and the Senior Secured Parties reserve all rights to object to any such request.

b. <u>Compliance with Approved Budget</u>. If Debtor's actual weekly costs and expenses exceed the weekly costs and expenses in the Approved Budget by more than ten percent (10%) then the Senior Secured Parties shall not be obligated to permit, and Debtor shall not be entitled to the continued use of cash collateral, without the prior written consent of each Senior Secured Party, which may be withheld in such Senior Secured Party's sole and absolute discretion, or further order of the Court.

c. <u>Use of Restricted Funds</u>. Bank shall permit Debtor to use Restricted Funds only in accordance with the provisions of Section 6.

d. <u>Waiver of Defaults</u>. Each Senior Secured Party may, in the exercise of its sole discretion, temporarily waive defaults under this Stipulation without affecting such Senior Secured Party's rights hereunder.

6. <u>DIP Financing/Restricted Funds</u>. Subject to the terms of the Interim Order and any Final Order (defined below), approving this Stipulation (the "DIP Orders"), (i) the Debtor may borrow up to $300,000 from TriplePoint under the Debtor-in-Possession Credit Facility, and TriplePoint shall make post-petition advances under the Debtor-in-Possession Credit Facility (collectively, the "DIP Loans"), as evidenced by that certain Debtor-in-Possession Promissory

SMRH:489280504.1

Note dated as of the date hereof (the "DIP Note"), a true and correct copy of which is attached hereto as Exhibit L, and (ii) the Debtor may utilize Restricted Funds, only in accordance with the following terms and conditions:

    a. <u>Funding Requests</u>. To the extent that Debtor does not have sufficient unrestricted funds to pay weekly expenses as provided in the Approved Budget, Debtor may request that TriplePoint make advances under the Debtor-In-Possession Credit Facility and that the Bank permit Debtor to use the Restricted Funds in amounts necessary to pay such expenses (each such request, a "Funding Request"); <u>provided</u> that the Debtor must certify in writing in connection with such Funding Request that, as of the date of such Funding Request, no Event of Default has occurred, no Event of Default is continuing, and no Event of Default will result from the Funding Request.

    b. <u>Funding Mechanics</u>. Upon receipt of a Funding Request, and in the absence of an Event of Default, TriplePoint agrees to make advances under the Debtor-in-Possession Credit Facility, and Bank agrees to permit the use of the Restricted Funds in accordance with the following:

        i. Prior to the use of any Restricted Funds, TriplePoint shall satisfy the Funding Request by making one or more DIP Loans in amounts not to exceed $182,784.36 in the aggregate;

        ii. At any time after the aggregate outstanding amount of the DIP Loans exceeds $182,784.36, each of Bank and TriplePoint severally, but not jointly, agree to fund 50% of the amount of the Funding Request; and

        iii. Notwithstanding anything herein to the contrary, (A) the aggregate amount of funding provided in response to a Funding Request shall not exceed the total amount of such Funding Request, (B) the aggregate amount of all outstanding DIP Loans shall not exceed $300,000, and (C) total amount of

STIPULATION RE USE OF CASH COLLATERAL AND DIP FINANCING

pre-petition and post-petition Restricted Funds used by Debtor shall not exceed $300,000.

c. <u>No Obligation to Extend Credit or Permit Use of Restricted Funds</u>. TriplePoint shall not have any obligation to make any DIP Loan or advance under the Debtor-in-Possession Credit Facility, and Bank shall not have any obligation to permit the use of Restricted Funds, unless the conditions precedent under this Stipulation and the DIP Orders have been satisfied in full or waived by Senior Secured Parties.

d. <u>Deposit of Cash Collateral</u>. Debtor will deposit all collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, into a separate account established solely for the purpose of receiving and holding such deposits (the "Restricted Account"). Except as provided for herein, Debtor will not use any Cash Collateral in which the Senior Secured Parties claim an interest without further consent of the Senior Secured Parties or order of the Bankruptcy Court in accordance with Section 363 of the Bankruptcy Code. Debtor will not have access to and will not be permitted to use funds held in the Restricted Account without the consent of each Senior Secured Party or order of the Bankruptcy Court.

e. <u>Reporting Requirements</u>. On the first business day of each week Debtor will provide the Senior Secured Parties with (1) budget to actual cash flow reports, (2) status reports with respect to the sale process, and (3) such other information as the Senior Secured Parties may reasonably request.

7. <u>Priming Lien and DIP Collateral</u>. Effective immediately upon entry of the Interim Order approving this Stipulation, pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and for the purpose of securing the DIP Loans, the Debtor shall grant to TriplePoint, and TriplePoint shall have, a valid, binding, enforceable, non-avoidable and automatically and properly perfected priming first priority post-petition lien on and security interest in ("Priming Lien") all assets currently part of the Debtor's bankruptcy estate or

STIPULATION RE USE OF CASH COLLATERAL AND DIP FINANCING

hereinafter acquired, which assets include without limitation, all of the Debtors' "Collateral" as defined in the Bank Loan Agreement, which includes all "Accounts", "Inventory", "General Intangibles", "investment property" (including any deposits or rights in escrows related to the stalking horse offer) and all other tangible and intangible personal property of the Debtors (collectively, the "DIP Collateral"); provided that DIP Collateral shall not include any avoidance causes of action arising under Chapter 5 of the Bankruptcy Code. Notwithstanding anything to the contrary in the Subordination Agreements, the DIP Loans shall be senior in payment to all other amounts owed by the Debtor and TriplePoint's Priming Lien shall be senior in priority to all other liens on or security interests in the DIP Collateral, subject to the Carve-Out (defined below) in each case; provided that such Priming Lien will not prime any holder of a perfected purchase money security interest or capital lease and, provided, further, that (i) the principal amount of the DIP Loans will be *pari passu* with the Bank's right to repayment of an amount equal to the Restricted Funds actually used by Debtor (whether such funds were used pre-petition or post-petition), (ii) the PIK Interest (as defined in the DIP Note) will be *pari passu* with the Bank's right of repayment at a rate equal to the then prevailing rate of interest charged by Bank under the Bank Loan Documents, (iii) the PIK Interest in excess of the then prevailing rate of interest charged by Bank under the Bank Loan Documents will be subordinated in right of repayment of the Bank Obligations on the terms and conditions set forth in the TriplePoint Subordination Agreement, (iv) the Priming Lien will be *pari passu* with the Bank's security interest in the DIP Collateral up to the sum of such amounts set forth in subsections (i) and (ii) of this Section, and (v) the Priming Lien will be subordinated to the Bank's security interest in the DIP Collateral for amounts exceeding the sum of such amounts set forth in subsections (i) and (ii) of this Section on the terms and conditions set forth in the TriplePoint Subordination Agreement. Upon entry of the Interim Order, the TriplePoint Subordination Agreement shall be amended solely to the extent necessary to effectuate the terms of this Section 7.

8. Validity of DIP Loans. This Stipulation and the DIP Orders shall constitute and evidence the validity and binding effect of the Debtor-in Possession Credit Facility and DIP Loans, which

DIP Loans shall be enforceable against the Debtor, its estate, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Case or in any other proceeding superseding or related to any of the foregoing. Upon entry of the Interim order, the DIP Loans will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the Debtor to TriplePoint under this Stipulation or the DIP Orders, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owed pursuant to this Stipulation and the DIP Orders. The DIP Loans shall be due and payable, without notice or demand, upon the occurrence of an Event of Default.

9. <u>Adequate Protection</u>. Without constituting an admission by the Senior Secured Parties of the adequacy of such protection, Debtor has agreed to provide the Senior Secured Parties with the following forms of adequate protection:

    a. <u>Replacement Lien and Adequate Protection</u>. Subject to the Carve-Out, each Senior Secured Party shall have a replacement post-petition lien on and security interest in (collectively, the "Adequate Protection Liens") all DIP Collateral pursuant to Sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code to secure any Post-Petition Loss to the same extent, validity and priority as the Senior Secured Parties' pre-petition liens; except as expressly modified in <u>Section 7</u>.

    b. <u>Superpriority Claim</u>. Subject to the Carve-Out, to the fullest extent permitted under section 507(b) of the Bankruptcy Code, the Senior Secured Parties shall also have a claim of the highest administrative priority above all administrative expenses incurred in this Chapter 11 case or subsequent Chapter 7 case, including such administrative expenses of the kind specified in or authorized pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code in the amount of any Post-Petition Loss.

    c. <u>No Challenges or Modification</u>. Debtor shall not in any manner challenge or attempt to avoid or subordinate the Senior Secured Parties' claims against Debtor

SMRH:489280504.1
STIPULATION RE USE OF
CASH COLLATERAL AND DIP FINANCING

under this Stipulation or the Pre-Petition Loan Documents, nor attempt to avoid the validity, perfection or priority of the Adequate Protection Liens, all of which are hereby confirmed.

10. Perfection of Priming Lien and Adequate Protection Liens. The Priming Lien and Adequate Protection Liens are hereby deemed effective, valid, and perfected as of the date of the entry of the Interim Order. The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Priming Lien and Adequate Protection Liens without the necessity of filing by any person or entity of any additional documents or other instruments or the taking of any additional action otherwise required to be filed or taken under applicable nonbankruptcy law for the perfection of security interests or other liens. Notwithstanding the foregoing, and notwithstanding perfection pursuant to this section, Debtor shall execute such perfection documents and take such perfection actions as the Senior Secured Parties may reasonably request from time to time.

11. Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of Interim Order. Through the date hereof, the Senior Secured Lenders have acted in good faith in connection with negotiating this Stipulation and making loans under the Debtor-in-Possession Credit Facility and consenting to the Debtor's use of Cash Collateral, as applicable, and their respective reliance on this Stipulation and the DIP Orders is in good faith. In the event any or all of the provisions of this Stipulation or the DIP Orders are hereinafter reversed, modified, amended, or vacated by a subsequent court order, the Senior Secured Parties are entitled to protections provided in Section 364(e) of the Bankruptcy Code.

12. No Third Party Rights. Except as explicitly provided for herein, this Stipulation does not create any rights for the benefit of any third party, including any creditor, equity holder or any direct, indirect, or incidental beneficiary. Subject to Section 2 of this Stipulation, the Debtor's stipulations and admissions shall be binding on all parties-in-interest, including, without limitation, the Committee or any other committees appointed in the Case (and any subsequent trustee of the Debtor's estate).

SMRH:489280504.1
STIPULATION RE USE OF
CASH COLLATERAL AND DIP FINANCING

13. <u>Conflicts</u>. To the extent of any inconsistencies between the terms and provisions of this Stipulation, on one hand, and the Pre-Petition Loan Documents and Subordination Agreements, on the other hand, the terms of this Stipulation shall govern. In all other respects, the Pre-Petition Loan Documents and Subordination Agreements shall remain in full force and effect, and the Senior Secured Parties shall continue to have all of the interests, rights and remedies provided in the Pre-Petition Loan Documents and Subordination Agreements as modified hereby.

14. <u>Events of Default</u>. Any one or more of the following events shall constitute an "Event of Default" hereunder:

    a. Debtor fails or neglects to perform, keep or observe any of the provisions of this Stipulation;

    b. Debtor fails to repay the DIP Loans and Restricted Funds used by the Debtor upon the expiration of Budget Period;

    c. Stalking Horse withdraws its offer to purchase the assets of Debtor on the terms set forth in the Letter of Intent dated February 18, 2019, or modifies such offer in a materially adverse manner, unless prior to such withdrawal, Debtor has a signed Asset Purchase Agreement with a different party;

    d. any representation or warranty herein or in any written statement, report, financial statement or certificate made or delivered pursuant to this Stipulation to either Secured Party by Debtor is untrue or incorrect in any material respect as of the date when made or deemed made;

    e. any material provision of any Loan Document for any reasons ceases to be valid, binding and enforceable in accordance with its terms (other than as consented to, or caused by, the Senior Secured Parties);

    f. any material breach of the Lease that gives the Landlord the right to terminate the Lease or to otherwise prevent the assignment and assumption thereof to the Stalking Horse on the terms set forth in the Stalking Horse LOI;

STIPULATION RE USE OF CASH COLLATERAL AND DIP FINANCING

g.   the appointment of a trustee or an examiner with enlarged powers (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) in this case;

h.   the conversion of this case to a case under Chapter 7 of the Bankruptcy Code;

i.   if there is any written pleading sustained by the Court pursuant to which a party in interest invalidates, subordinates or avoids any material portion of the Senior Secured Parties' lien on or security interest in the Pre-Petition Collateral or DIP Collateral or any material reduction or subordination of the Obligations by reason of avoidance, invalidation, offset or, except as a result of payments, otherwise;

j.   except as permitted herein, the use of Cash Collateral under Section 363(c) of the Bankruptcy Code without each Senior Secured Party's prior written consent or the consent of the Court;

k.   any party in interest obtaining relief from the automatic stay applicable under Section 362 of the Bankruptcy Code in this case to exercise its rights as lienholder or secured party against any portion of the Pre-Petition Collateral or DIP Collateral, unless otherwise consented to each Senior Secured Party, in writing;

l.   an interim order approving this Stipulation ("Interim Order") is not entered by the Bankruptcy Court within ten (10) business days following the Petition Date;

m.   a final order approving this Stipulation ("Final Order") is not entered by the Bankruptcy Court within forty (40) business days following the Petition Date;

n.   an order approving Debtor's proposed stalking horse procedures for the sale of substantially all of its assets (the "Sale Procedures Order") is not entered by the Bankruptcy Court within twenty one (21) calendar days following the Petition Date, or such later date as agreed to by Debtor and the Senior Secured Parties;

o.   an order approving the sale of substantially all of Debtor's assets in not entered by the Bankruptcy Court within sixty (60) calendar days following the Petition Date, or such later date as agreed to by Debtor and the Senior Secured Parties;

SMRH:489280504.1

p.  the entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating, rescinding or otherwise modifying the Pre-Petition Loan Documents, the Interim Order, the Final Order or the Sale Procedures Order without each Senior Secured Party's prior written consent;

q.  the sale without the consent of each Senior Secured Party of all or substantially a material portion of Debtor's assets outside the ordinary course of business either through a sale under Section 363 of the Bankruptcy Code, or otherwise;

r.  if there is any written objection sustained by the Court to the Motion; or

s.  the filing of any Chapter 11 plan inconsistent with this Stipulation.

15.  Rights and Remedies Upon an Event of Default. Upon the occurrence of an Event of Default, (a) all of TriplePoint's commitments to extend credit under the Debtor-in-Possession Credit Facility or otherwise make DIP Loans and (b) each Senior Secured Party's consent to the Debtor's use of Cash Collateral shall immediately terminate without notice or presentment. Upon the occurrence of an Event of Default which is not otherwise cured by Debtor within five (5) business days following Debtor's receipt of written notice of default from the Senior Secured Parties, (a) each Senior Secured Party may seek via *ex parte* submission of a declaration by its attorney or authorized representative as to the Event of Default relief from the automatic stay imposed by Section 362 of the Bankruptcy Code, provided, however, that Debtor shall not be precluded from asserting that it is not in default, seek continued use of Cash Collateral or oppose such relief.

16.  Other Modifications to the Automatic Stay. The automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified, without the need for any further action of the Senior Secured Parties or the Court, to the extent necessary to permit the Senior Secured Parties to give effect to any rights granted in this Stipulation, including, without limitation, to the extent necessary to permit the Senior Secured Parties to debit Debtor's bank accounts at Bank for Bank's customary cash management and servicing fees as they arise in the ordinary course of business.

SMRH:489280504.1

17. <u>Modification of Stipulation</u>. The Senior Secured Parties may seek further protection of its security interests if the Senior Secured Parties deems necessary in these or any superseding proceedings. Further, Senior Secured Parties and Debtor may agree to modifications to the Approved Budget without further court order.

18. <u>Carve Out for Professionals</u>. Each of the Senior Secured Parties consents on its own behalf (and to the extent permitted by the Subordination Agreements, on behalf of the Subordinated Creditors), notwithstanding its lien, security interest and administrative expense priority, to the payments by Debtor of the Carve-Out, to be paid solely from the proceeds of a successful 363 sale, in the amounts set forth in the Approved Budget. For purposes of this Stipulation, the term "Carve-Out" shall encompass the following expenses: (i) unpaid post-petition professional fees and expenses payable to each legal advisor retained by the Debtor that are incurred or accrued prior to the occurrence of an Event of Default, but subject to the aggregate amount(s) ultimately allowed by the Court pursuant to Sections 328, 330, 331, and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Event of Default) (collectively, the "Debtor Professional Fees"); (ii) unpaid post-petition professional fees and expenses payable to each legal advisor retained by the Committee that are incurred or accrued prior to the occurrence of an Event of Default, but subject to the aggregate amount(s) ultimately allowed by the Court pursuant to Sections 328, 330, 331, and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Event of Default) (collectively, the "Committee Professional Fees"); (iii) fees payable to James Beriker pursuant to the Offer of Employment by Munchery, Inc., dated as of January 22, 2019, by and between James Beriker and the Debtor (the "Beriker Fees"); (iv) fees payable to (x) the Clerk of the Bankruptcy Court or (y) the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) that have or will come due prior to the occurrence of an Event of Default (collectively, the "U.S Trustee and Court Fees"); and (v) an amount reserved for distribution to the holders of allowed, unsecured creditors pursuant to a confirmed plan of reorganization (the "GUC Proceeds Carve-Out"); <u>provided</u> that the amount of the Carve-Out for each category shall vary based on the net proceeds received upon

SMRH:489280504.1
STIPULATION RE USE OF CASH COLLATERAL AND DIP FINANCING

the sale of substantially all of the Debtor's assets pursuant to Section 363(b) of the Bankruptcy Code and be capped at the amounts set forth in the table below.

| Net Sale Proceeds/ Carve-out Amount | <$2,000,000 | $2,000,00 - $3,000,000 | $3,000,000 - $4,000,000 | $4,000,000 + |
|---|---|---|---|---|
| Debtor Professional Fees | $50,000 | $60,000 | $70,000 | $100,000 |
| Committee Professional Fees | $25,000 | $30,000 | $40,000 | $50,000 |
| Beriker Fees | $40,000 (not to exceed 2%) | $65,000 | $115,000 | $250,000 |
| U.S. Trustee and Court Fees | $20,000 | $30,000 | $40,000 | $50,000 |
| GUC Proceeds Carve-Out | $0 | $50,000 | $100,000 | $150,000 |
| **Aggregate Carve-Out** | **$135,000** | **$235,000** | **$365,000** | **$600,000** |

For the avoidance of doubt, the Senior Secured Parties shall have the right to object to the allowance by the Court of any such professional fees and expenses, but the Senior Secured Parties may not object to the payment of any such professional fees and expenses which are allowed by the Court. For avoidance of doubt, the amounts set forth above in connection with the Carve-Out are not intended to cap or limit the amounts that may be claimed and paid once the Senior Secured Parties are paid in full.

19. <u>Reservation of Rights</u>. Nothing herein constitutes consent by the Senior Secured Parties to these proceedings or to the continuation thereof or to the use of Cash Collateral except as provided herein, or constitutes a waiver by the Senior Secured Parties of any right it may have, including, without limitation, to object to the reasonableness of any fees or costs of professionals described herein, to oppose or object to any plan of reorganization, to challenge any impairment of its claim, its security interests, the Pre-Petition Collateral or DIP Collateral, and incident thereto to introduce such evidence of its claim, its security interest and the value of the Pre-Petition Collateral or DIP Collateral as may be appropriate in the circumstances.

20. <u>Further Assurances</u>. Debtor shall execute and deliver to the Senior Secured Parties any and all further agreements, instruments and documents which may be reasonably necessary to

effectuate the purposes of this Stipulation, including, without limitation, any UCC-1 Financing Statements. The Senior Secured Parties are entitled to reimbursement of all costs of the Senior Secured Parties' searches, title policies or endorsements, recording expenses or other related the Senior Secured Parties expenses.

21. <u>Binding Stipulation</u>. The parties agree that this Stipulation shall be submitted to the above-named Bankruptcy Court for its approval. Upon such approval, this Stipulation shall be binding upon and shall inure to the benefit of the parties and their respective successors or assigns, including, without limitation, any Chapter 11 or Chapter 7 trustee in these or any superseding bankruptcy proceedings. All of the Senior Secured Parties' rights and remedies hereunder are not exclusive and are in addition to all rights and remedies provided by law, or by any other agreement between Debtor and the Senior Secured Parties, or otherwise. If any or all of the provisions of this Stipulation are hereafter modified, vacated or stayed by order of this or any other court, such stay, modification or vacation shall not affect the validity of any debt to the Senior Secured Parties incurred pursuant to this Stipulation and which is incurred prior to the effective date of such stay, modification or vacation, or the validity and enforceability of any lien or priority authorized hereby, and notwithstanding such stay, modification or vacation, any use of funds occurring pursuant to this Stipulation prior to the effective date of such modification, stay or vacation, to or for the benefit of Debtor, shall be governed in all respects by the original provisions of this Stipulation, and the Senior Secured Parties shall be entitled to all the rights, privileges and benefits, including the liens and security interests and priorities granted herein, with respect to all such advances.

22. <u>Integration</u>. The Pre-Petition Loan Documents and this Stipulation constitute the complete agreement of the parties with respect to the subject matter thereof and may not be modified, altered or amended except by an agreement in writing executed by Debtor and the Senior Secured Parties. No amendment or waiver shall be effective unless the same shall be in writing.

23. <u>Miscellaneous</u>. This Stipulation may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be

SMRH:489280504.1

STIPULATION RE USE OF
CASH COLLATERAL AND DIP FINANCING

Case: 19-50232    Doc# 9    Filed: 02/28/19    Entered: 02/28/19 16:11:20    Page 20 of 30

1  deemed to be an original, and all of which, when taken together, shall constitute but one and

2  the same agreement.  Debtor and the Senior Secured Parties anticipate executing this

3  Stipulation in counterparts in separate locations, delivering a copy of the executed counterpart

4  signature pages hereof to each other by facsimile, and subsequently delivering to each other

5  originals of the executed signature pages.  Debtor and the Senior Secured Parties hereby agree

6  that this Stipulation shall be deemed effective upon the Senior Secured Parties' receipt by

7  facsimile or electronic copy of the signature page hereof executed by Debtor's counsel, and no

8  subsequent delay or failure by either party hereto to deliver to the other party hereto such

9  party's original signature page shall diminish the effectiveness of this Stipulation.

10      24. <u>Notice</u>. All notices required or permitted under this Stipulation or the DIP Orders shall

11  be sent to the respective party and such party's attorney at the address listed below or such

12  other address provided by the party in writing, by electronic mail, certified mail, return receipt

13  requested, recognized overnight courier, or hand delivery.  In the event of notice by certified

14  mail, notice shall be effective upon receipt or refusal of delivery as shown by the return

15  receipt.  In the event of notice by electronic mail, notice shall be effective upon successful

16  transmission.  In the event of notice by hand delivery, notice shall be effective upon receipt.  In

17  the event of notice by overnight courier, notice shall be effective upon delivery, without the

18  necessity of acknowledgement of receipt.

19      If notice is given to Debtor, it shall be sent to:

20          Munchery Inc.

21          Attention: James Beriker

22          Email: jberiker@munchery.com

23      With a copy to (which shall not constitute notice):

24          Finestone Hayes LLP

25          456 Montgomery Street, 20th Floor

26          San Francisco, California 94104

27          Attention: Stephen D. Finestone

28

SMRH:489280504.1

| | |
|---|---|
| 1 | Email: sfinestone@fhlawllp.com |
| 2 | If notice is given to Bank, it shall be sent to: |
| 3 | Comerica Bank |
| 4 | \|333 West Santa Clara St., 5th Floor |
| 5 | San Jose, CA 95113 |
| 6 | Attn: Jim Petroff |
| 7 | With a copy to (which shall not constitute notice): |
| 8 | Comerica Bank,  MC 4605 |
| 9 | 2321 Rosecrans Avenue, Suite 5000 |
| 10 | El Segundo, CA 90245 |
| 11 | Attn: Natali Amir |
| 12 | - and - |
| 13 | Sheppard Mullin Richter & Hampton LLP |
| 14 | 333 South Hope Street, 43rd Floor |
| 15 | Los Angeles, California  90071-1448 |
| 16 | Attention: Kyle Mathews |
| 17 | Email: Kmathews@sheppardmullin.com |
| 18 | If notice is given to TriplePoint, it shall be sent to: |
| 19 | TriplePoint Venture Growth BDC Corp. |
| 20 | 2755 Sand Hill Road |
| 21 | Menlo Park, California 94025 |
| 22 | Attention: Kevin Thorne, Esq. |
| 23 | Email: kthorne@triplepointcapital.com |
| 24 | With a copy to (which shall not constitute notice): |
| 25 | McDermott Will & Emery LLP |
| 26 | 2049 Century Park East, 38th Floor |
| 27 | Los Angeles, California 90067 |
| 28 | |

SMRH:489200504.1

STIPULATION RE USE OF
CASH COLLATERAL AND DIP FINANCING

Case: 19-30232   Doc# 9   Filed: 02/28/19   Entered: 02/28/19 16:11:20   Page 28 of 30

1           Attention: Gary Rosenbaum

2           Email: grosenbaum@mwe.com

3             - and -

4           McDermott Will & Emery LLP

5           340 Madison Avenue

6           New York, New York 10173

7           Attention: Riley Orloff

8           Email: rorloff@mwe.com

9     25. <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this

10 Stipulation and the related DIP Orders according to their terms.

11

12                  [Signature Page to Follow]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:489280504.1

IN WITNESS HEREOF, the parties hereto have cause this Stipulation to be executed as of the date set forth below:

Dated: February 28, 2019

FINESTONE HAYES LLP

By     /s/ Stephen D. Finestone
_____
STEPHEN D. FINESTONE
Attorneys for MUNCHERY INC.

Dated: February 28, 2019

MCDERMOTT WILL & EMERY LLP

By     /s/ Gary B. Rosenbaum
_____
GARY B. ROSENBAUM
Attorneys for TRIPLEPOINT VENTURE GROWTH
BDC CORP.

Dated: February 27, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By     /s/ Kyle Mathews
_____
KYLE MATHEWS
Attorneys for COMERICA BANK