Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
Ryan A. Witthans (301432)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, CA 94104
Telephone: (415) 421-2624
Facsimile: (415) 398-2820

Attorneys for Debtor and Debtor-in-Possession,
Munchery, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No.: 19-30232 |
| MUNCHERY INC., | Chapter 11 |
| Debtor and Debtor-in-Possession. | **MOTION FOR APPROVAL OF STIPULATION REGARDING USE OF CASH COLLATERAL, PROVISION OF ADEQUATE PROTECTION AND DEBTOR IN POSSESSION FINANCING** |
| | Date:<br>Time:<br>Place: 450 Golden Gate Ave, 16th Floor<br>San Francisco, CA 94102 |

Debtor and Debtor in Possession, Munchery, Inc. ("**Debtor**" or "**Munchery**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), files this motion (the "**Motion**") for entry of an order in substantially in the form attached hereto as **Exhibit A** (the "**DIP Order**"), seeking to, among other things:

(i) Authorize Debtor to use Cash Collateral as described and defined in the Stipulation Regarding Use Of Cash Collateral, Provision of Adequate Protection And Debtor In Possession Financing (the "**Stipulation**") entered into between Debtor and Comerica

MOTION FOR APPROVAL OF STIPULATION 1

Bank (**"Comerica"**) and TriplePoint Venture Grown BDC Corp (**"TriplePoint"**) (Comerica and TriplePoint are referred to collectively as the **"Secured Lenders"**);

(ii) Authorize Debtor to provide the adequate protection provided for in the Stipulation;

(iii) Authorize Debtor to obtain a senior secured super-priority loan in the maximum principal amount of $300,000 (the "**DIP Financing**"), substantially on the terms and conditions set forth in the DIP Order and the Debtor in Possession Financing Promissory Note (the "Note"), dated as of February 26, 2019, between Debtor and TriplePoint, a copy of which is attached hereto as <u>**Exhibit B**</u> and the Stipulation and together with any and all related documents and agreements entered into in connection with or related to the DIP Financing, (the "**DIP Loan Documents**");

(iv) Authorize Debtor to perform such other and further acts as may be necessary or appropriate in connection with the DIP Loan Documents;

(v) Grant the Secured Lenders, subject only to the Carve-Out (as described in the Stipulation and defined below), super-priority administrative claim status pursuant to section 364(c)(1) of the United States Bankruptcy Code, 11 U.S.C. § 101, *et. seq.* (the "**Bankruptcy Code**"), in respect to all obligations under the DIP Financing;

(vi) Authorize Debtor to grant certain liens to the Secured Lenders limited as described below pursuant to section 364(d)(1) of the Bankruptcy Code (the "**DIP Liens**");

(vii) Authorize Debtor to use the Secured Lenders' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "**Cash Collateral**") for the purposes described below and as provided for in the Stipulation and the budget attached thereto, pursuant to Bankruptcy Code section 363(c);

(viii) Authorize Debtor to provide adequate protection, pursuant to the Bankruptcy Code sections 361, 362, 363(e) and 364(d), to the Secured Lenders in the form of, among

other things, the DIP Liens and a super-priority claim for DIP Financing, and adequate protection (as defined below);

(ix) To the extent appropriate, schedule, pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), an interim hearing (the "**Interim Hearing**") on the Motion to consider entry of the DIP Order on an interim basis for a period through and including the date of a final hearing on the Motion (the "**Final Hearing**"), to be used to fund operations and pay other administrative expenses pending the Final Hearing;

In bringing this motion and seeking the relief described above, Debtor is relying on the Declaration of James Beriker in Support of Debtor's First Day Motions (the **"Beriker Declaration"**). The factual summary provided below is brief in nature and parties are encouraged to review the much more detailed description provided in the Beriker Declaration.

## STATUS OF THE CASE AND JURISDICTION

1. On February 28, 2019 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. Debtor continues to operate as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in this case.

4. This court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105, 361, 363, and 364(c) and 364(d) of the Bankruptcy Code, and Bankruptcy Rules 2002 and 4001.

## BACKGROUND OF THE DEBTOR AND ITS BUSINESS

Munchery was a startup business, founded in 2011, specializing in the preparation and delivery of healthy and delicious meals to consumers and businesses. Overall, Munchery raised over $120 million in venture capital funding. Ultimately, Munchery was not successful. At one point Munchery operated in San Francisco, Los Angeles, Seattle and New York. However, in May 2018, Munchery closed its operations outside of San Francisco and sought to consolidate and rebuild its business around its San Francisco operations. Munchery's San Francisco operations were conducted through a large leased facility located at 220 Shaw Road, South San Francisco, CA 94080 (the "Facility"). The Facility includes approximately 70,000 square feet of rental space and contains valuable improvements and equipment related to the operation of Debtor's business.

After consolidation of its business, Munchery continued to operate in the San Francisco Bay Area out of the Facility until January 2019, at which time Munchery decided to shutter its operations. Munchery's current focus is to recover value on behalf of its creditors from the following assets groups: (a) the Facility and certain fixtures and tangible assets located therein; (b) intangible assets, including intellectual property, customer lists, and tradename(s); and (c) net operating losses, which could be as high as $116 million.

In very general terms, Debtor's debt structure is as follows:

a. Senior Secured Debt of approximately $5.3 million ($1.9 million to Comerica and $3.4 million to TriplePoint);

b. Subordinated secured debt/convertible debt of approximately $23 million;

c. Unsecured debt to vendors, suppliers and various counter parties of approximately $3 million;

d. Customers who have gift cards balances of approximately $3 million.

Prior to the Debtor's bankruptcy filing, Debtor entered into a non-binding letter of intent (the "Stalking Horse LOI") with Gate Gourmet, Inc. (the "Stalking Horse") as a prospective buyer to take over the Lease and to acquire Debtor's fixtures and assets within the Facility (the

MOTION FOR APPROVAL OF STIPULATION 4

"Purchased Assets"). Under the Stalking Horse LOI, the Stalking Horse proposes to pay $5,000,000 to the Debtor in exchange for the Purchased Assets and assignment of the Lease (with certain modifications agreed to between the Stalking Horse and the Landlord). Debtor and the Stalking Horse have reached an agreement regarding bid procedures with respect to the transaction, including a minimum overbid of $250,000 and a breakup fee of $150,000 (the "Proposed Bid Protections"), which procedures will be the subject of a separate motion filed with the Bankruptcy Court.

This Motion seeks authorization for the use of Cash Collateral (as defined below) and the Debtor-in-Possession Credit Facility (as defined below) for a period commencing on the petition date and ending on May 3, 2019. The Debtor anticipates that the agreed-to period will be sufficient time to obtain approval of the Stalking Horse APA and close a sale transaction with the Stalking Horse (or any overbidder) under Bankruptcy Code section 363(b). The proceeds of a sale transaction should be sufficient to pay off Comerica in full and pay off a substantial portion of the pre-petition amounts owed to TriplePoint.

## SUMMARY OF RELEVANT TERMS[1]

The purpose of the DIP Financing is to fund Debtor's limited operations and pay limited obligations (primarily its Premises lease and salaries of its two employees) for an eight week period to allow Debtor to close a sale transaction that will pay off most of the Senior Secured Debt, while providing a limited carveout for costs of administration and for other creditors. As set forth in greater detail below, the Debtor and Senior Secured Parties have agreed as follows:

- The Debtor's use of Cash Collateral is governed by the Senior Secured Parties' existing loan agreements with the Debtor, subject to specific budget constraints set forth in the Approved Budget (as defined below);

---

[1] This section provides an overview of the relevant terms and conditions of the Stipulation and is not intended to substitute for the specific terms and conditions therein. In the event of a conflict between this summary and the terms and conditions of this Stipulation, the terms and conditions of the Stipulation shall control. Capitalized terms not defined herein have the meaning given them in the Stipulation

MOTION FOR APPROVAL OF STIPULATION 5

- The Debtor's access to financing under the Debtor-in-Possession Credit Facility is governed by the terms of this Stipulation and evidenced by a new debtor-in-possession promissory note between Munchery and TriplePoint. The maximum principal amount of the note is $300,000, with interest accruing at a rate of 12.5 percent per annum. The maturity date of the Debtor-in-Possess Credit Facility and related promissory note is May 3, 2019. In addition to the new promissory note, Debtor will utilize funds held in a restricted account at Comerica. The combined amount of the cash collateral and new money is capped at $600,000;

- In consideration of the Senior Secured Parties' consent to use of Cash Collateral, the Senior Secured Parties will receive replacement liens on and security interests in all assets and other property of the Debtor's bankruptcy estate, with the same priority as their respective pre-petition liens and security interests, subject to the Carve-Out (as defined below). The Senior Secured Parties will also receive a super-priority claim to the extent permitted by Section 507(b) in the amount of any post-petition loss/diminution;

- In consideration for providing post-petition financing under the Debtor-in-Possession Credit Facility, TriplePoint will receive a priming lien on all Debtor's assets, whether part of the Debtor's estate or subsequently acquired, other than the proceeds received from any avoidance actions under Chapter 5 of the Bankruptcy Code, subject to the Carve-Out and the TriplePoint Subordination Agreement (as defined below) as such agreement is modified by the terms of the Stipulation;

- The Stipulation also provides for releases by the Debtor in favor of the Senior Secured Parties and stipulates to the validity of their loan amounts, security interests and liens subject to a challenge period for the Committee (as defined below) and other parties in interest (other than the Debtor);

- The Senior Secured Parties agree to a Carve-Out for certain administrative expenses, including expenses incurred by the Debtor's professionals, the Committee's professionals, a fee for James Beriker (if he successfully concludes a sale of

substantially all of the Debtor's assets to the Stalking Horse or an overbidder and the Debtor subsequently consummates such sale), U.S. Trustee's fees, as well as a recovery for the Debtor's general unsecured creditors. The amount allocated to the Carve-Out is set forth in the Stipulation and varies depending on the net sale proceeds received by the Debtor in a sale of substantially all of the Debtor's assets; and

- Finally, the Stipulation defines certain events of default and provides that the Senior Secured Parties' consent to the Debtor's use of Cash Collateral and TriplePoint's obligation to extend credit under the Debtor-in-Possession Credit Facility shall terminate immediately upon an event of default. If an event of default is not cured within five business days, the Stipulation allows the Senior Secured Parties to seek *ex parte* relief from stay based upon the declaration of its counsel or representative, while providing Debtor the opportunity to contest the existence of a default or seek continued use of Cash Collateral.

## LOAN-FINANCING BACKGROUND

The present bankruptcy case (the "Case") was commenced on February 28, 2019 (the "Petition Date"), when Debtor filed its petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"). Debtor continues in possession of its assets, as a debtor-in-possession and continues to operate its business and no official committee of unsecured creditors or chapter 11 trustee has been appointed in this case.

1) Comerica has previously made loans (collectively, the "Bank Loans") to Debtor, which are evidenced by, and pursuant to, among other things, the Loan and Security Agreement dated as of December 18, 2014 (as has been amended, supplemented, replaced, restated or otherwise modified, the "Bank Loan Agreement") by and between Debtor and Comerica. The Bank Loans and all other liabilities and obligations under the Bank Loan Agreement and the other Bank Loan Documents (as defined below) (collectively, the "Bank Obligations") are secured by all personal property assets of Debtor pursuant to the terms of the Bank Loan Agreement and certain other Bank Loan Documents (the "Pre-Petition Bank Non-IP Collateral"). The foregoing security interest is perfected by the filing of a financial statement with the

Delaware Department of State, Filing No. 20145291430 (the "Bank Financing Statement").

2) Debtor and Comerica entered into an Amended and Restated Prime Referenced Rate Addendum to Loan and Security Agreement dated as of April 17, 2017 (as has been amended, supplemented, replaced, restated or otherwise modified, the "Bank Interest Rate Addendum").

3) Debtor and Comerica entered into that certain Standby Letter of Credit Applications pursuant to which Comerica issued certain letters of credit and Debtor posted certain cash collateral as security for its reimbursement obligations to Comerica. Pursuant to the LC Application and Pledge Agreements, Debtor pledged to Bank a lien on and security interest in certain blocked deposit accounts held at Bank (the "Pledged Account(s)"). As of January 21, 2019, the Pledged Account(s) held pledged funds in the amount of $329,270.37 (the "Restricted Funds"). Prior to the Petition Date, Comerica consented to the use of Restricted Funds to protect and preserve the Debtor's assets. The balance of the Pledged Account(s) as of the Petition Date is approximately $146,522.37.

4) The Bank Obligations are also secured by, among other things, the Debtor's intellectual property (the "Pre-Petition Bank IP Collateral" and, together with the "Pre-Petition Bank Non-IP Collateral, the Pre-Petition Bank Collateral") pursuant to the Intellectual Property Security Agreement dated as of January 31, 2017 (as has been or may be amended, supplemented, replaced, restated or otherwise modified, the "Bank IP Agreement"), and together with the Bank Loan Agreement and the Bank Pledge Agreements, collectively the "Bank Collateral Documents") by and between Debtor and Comerica.

5) The Bank Collateral Documents, the Bank Interest Rate Addendum, all amendments, modifications or supplements to any of the foregoing, this Stipulation, and all other documents executed in connection with the Bank Loan Agreement or this Stipulation, are hereinafter referred to collectively as the "Bank Loan Documents".

6) TriplePoint has previously made loans (collectively, the "TriplePoint Loans") to Debtor, which are evidenced by, and pursuant to, among other things, the Plain English Growth Capital Loan and Security Agreement dated as of June 30, 2016 (as has been amended,

MOTION FOR APPROVAL OF STIPULATION 8

supplemented, replaced, restated or otherwise modified, the "TriplePoint Loan Agreement"),by and between Debtor and TriplePoint. The TriplePoint Loans and all other liabilities and obligations under the TriplePoint Loan Agreement and the other TriplePoint Loan Documents (as defined below) (collectively, the "TriplePoint Obligations" and, together with the Bank Obligations, the "Pre-Petition Obligations") are secured by all personal property assets of Debtor pursuant to the terms of the TriplePoint Loan Agreement and certain other TriplePoint Loan Documents defined below (the "Pre-Petition TriplePoint Non-IP Collateral"). The foregoing security interest is perfected by the filing of a financial statement with the Delaware Department of State, Filing No. 20163952395 (the "TriplePoint Financing Statement"). TriplePoint's security interests are subordinate to those of the Comerica on the terms and conditions set forth in the TriplePoint Subordination Agreement (as defined below).

7) The TriplePoint Obligations are also secured by, among other things, the Debtor's intellectual property (the "Pre-Petition TriplePoint IP Collateral", together with the Pre-Petition TriplePoint Non-IP Collateral, the Pre-Petition TriplePoint Collateral" and, together with the Pre-Petition Bank Collateral, the "Pre-Petition Collateral") pursuant to the Plain English Intellectual Property Security Agreement dated as of June 30, 2016 (as has been or may be amended, supplemented, replaced, restated or otherwise modified, the "TriplePoint IP Agreement"), and together with the TriplePoint Loan Agreement, the "TriplePoint Collateral Documents") by and between Debtor and TriplePoint.

8) The TriplePoint Collateral Documents, all amendments, modifications or supplements to any of the foregoing, this Stipulation, and all other documents executed in connection with the TriplePoint Loan Agreement or this Stipulation, are hereinafter referred to collectively as the "TriplePoint Loan Documents" and, together with the Bank Loan Documents, as the "Pre-Petition Loan Documents".

9) All present and future indebtedness of Debtor to, and any and all present and future liens on and security interests in any present and future assets of Debtor in favor of the Subordinated Creditors (defined below), respectively, were subordinated to the Bank Obligations and to any and all present and future liens on and security interests in any and all present and

MOTION FOR APPROVAL OF STIPULATION 9

future assets of Debtor in favor of Bank, by the following respective Subordination Agreements (as have been or may be amended, supplemented, replaced, restated or otherwise modified, the "Subordination Agreements"):

i) The Subordination Agreement, dated as of June 30, 2016 between TriplePoint and Comerica (the "TriplePoint Subordination Agreement");

ii) The Subordination Agreement, dated as of February 15, 2017, among Sherpa Ventures Fund, LP, SherpaEverest Fund, LP, Menlo Ventures XI, L.P., MMEF XI, L.P., Menlo Ventures XII, L.P., Menlo Entrepreneurs Fund XII, L.P., MMEF XII, L.P., BV eVenture Fund II, LP (collectively, the "Sherpa Subordinated Creditors") and Bank;

iii) The Subordination Agreement, dated as of February 15, 2017, among the Sherpa Subordinated Creditors and TriplePoint;

iv) The Subordination Agreement dated as of October 2, 2017, among COTA Capital Master Fund, L.P., OA3, LLC, and certain other subordinated creditors signatory thereto (collectively, the "COTA Subordinated Creditors"), Sherpa Subordinated Creditors and Bank;

v) The Subordination Agreement dated as of October 2, 2017, among the COTA Subordinated Creditors, the Sherpa Subordinated Creditors and TriplePoint;

vi) The Subordination Agreement, dated as of January 25, 2018, among the Simkin Living Trust 5-1-2017, RDG Inc., the Baldwin Family Trust dated 9-16-15, the Lezack Living Trust, Smokey Investments LP, IPV SS II LLC, Jordan Simkin, Gayl Simkin, Nathan Fields, Murray Simkin and VIVE VC Fund, L.P. collectively, the "VIVE Subordinated Creditors" and together with TriplePoint, the Sherpa Subordinated Creditors and the COTA Subordinated Creditors, collectively the "Subordinated Creditors") and Comerica; and

vii) The Subordination Agreement, dated as of January 25, 2018, among the VIVE Subordinated Creditors and TriplePoint.

10) The provisions of the TriplePoint Subordination Agreement will be modified by this Stipulation. Except as expressly amended hereby, all Subordination Agreements shall remain in full force and effect.

11) Certain Events of Default occurred under the terms of the Pre-Petition Loan Documents in May 2018.

12) Comerica and Debtor entered into a Forbearance Agreement ("Forbearance Agreement") as of May 24, 2018.

13) All of Debtor's liquid assets at the time of Debtor's bankruptcy filing and wherever located now are the cash collateral of Senior Secured Parties (the "Cash Collateral") pursuant to Section 363 of the Bankruptcy Code. This Stipulation is intended to authorize the Debtor to: (i) use any Restricted Funds and any other funds that are in the Pledged Account(s) as of the Petition Date; (ii) obtain post-petition financing from TriplePoint in the amount of up to $300,000 pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code (the "Debtor-In-Possession Credit Facility"); and (iii) use the Senior Secured Parties' Cash Collateral through the end of the Budget Period (described below), while providing adequate protection of the Senior Secured Parties' interests therein pursuant to Section 361 and 363 of the Bankruptcy Code.

14) The Debtor requires post-petition financing and requires the continued use of Cash Collateral in order to maintain the value of the Debtor's assets. Subject to Court approval of this Stipulation, TriplePoint is willing to provide post-petition financing and the Senior Secured Parties are willing to permit Debtor to use Cash Collateral for a period beginning on the Petition Date and continuing through May 3, 2019 (the "Budget Period") upon the terms and conditions as provided for herein and upon the provision of adequate protection under Section 361 of the Bankruptcy Code. Accordingly, the Debtor and Senior Secured Parties seek authority to establish a basis upon which the Debtor may borrow up to $300,000 under the Debtor-in-Possession Credit Facility and use Cash Collateral in accordance with the terms set forth herein and to provide for the adequate protection of the security interests of each of the Secured Parties in the collateral utilized by the Debtors.

15) In order to provide Senior Secured Parties with adequate protection from any loss, decrease, diminution or decline in the value of Senior Secured Parties' interest in its Pre-Petition Collateral caused or resulting from the use, sale or lease thereof by Debtor in accordance with Section 363(e) of the Bankruptcy Code, or from the consequences of the automatic stay imposed by Section 362 of the Bankruptcy Code ("Post-Petition Loss"), the Senior Secured Parties are entitled to adequate protection under Sections 361 and 363(e) of the Bankruptcy Code in the form of replacement liens on and security interests in all assets and other property of Debtor with the same priority as Senior Secured Parties' prepetition liens on and security interests in the Pre-Petition Collateral (subject to the modifications of the TriplePoint Subordination Agreement contained herein), cash payments and other protections contained in this Stipulation, as well as a super-priority administrative claim under Section 507(b), subject to the limitations set forth herein.

## LOCAL GUIDELINE DISCLOSURES

Pursuant to this Court's Guidelines for Cash Collateral and Financing Motions & Stipulations (the "**Guidelines**"), a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with the Guidelines. The references are to the paragraphs in the Stipulation unless indicated otherwise. If a particular Guideline is not listed below, Debtor does not believe there is a disclosure or provision related to such Guideline.

**Granting of Priority or a Lien on Property of the Estate and a Carve-Out for Professional Fees:**

Paragraph 7 of the Stipulation provides for a priming lien, post-petition lien and security interest to secure the DIP Loans in all of Debtor's assets other than avoidance actions under Chapter 5 of the Bankruptcy Code. The liens described herein are, however, subject to (i) any

MOTION FOR APPROVAL OF STIPULATION 12

purchase money security interest in the Collateral or any capital lease; (ii) a "carve out"(the **Carveout"**) as described in paragraph 18 of the Stipulation with amounts that vary depending on the return on the assets sales (for purposes of perspective, the price under the LOI with Gate is for $5,000,000) for professionals employed by the estate and other costs of administration pursuant to 28 U.S.C. § 1930.

**Providing Adequate Protection or Priority with Respect to a Pre-Petition Claim:**

Paragraph 9 of the Stipulation provide for replacement liens and adequate protection as well as a super-priority Claim, subject to the Carveout. The replacement liens on the DIP Collateral to secure any loss are to be to the same extent, validity and prior as the pre-petition liens except as provided in paragraph 7 of the Stipulation (discussed above).

**Perfection of the Liens Provided in the Stipulation:**

Paragraph 10 of the Stipulation provides that the liens provided in the Stipulation are deemed effective, valid and perfected as of the date of the Interim Order without regard to nonbankruptcy law. The same provision, however, provides that Debtor shall execute any documents reasonably requested by the Senior Secured Parties to perfect the same.

**Waivers of Rights Under Bankruptcy Code Section 506(c):**

Paragraph 3 of the Stipulation provides that the estate waives its right to seek a surcharge of the Pre-petition Collateral under Section 506(c) and Section 552(b).

**Validity of Liens and Obligations, Challenges, Releases, Waivers or Limitation of a Claim:**

Paragraph 1 of the Stipulation includes an agreement/admission by the Debtor as to the validity and enforceability of the loan documents, the balance of the loans, and an

MOTION FOR APPROVAL OF STIPULATION 13

acknowledgment that Debtor has no claims, set-offs or defenses to the Obligations, and that the liens are valid, unavoidable, perfected and in first position.

Paragraph 2 of the Stipulation provides that the an objection to Senior Secured Lender's Pre-Petition Obligations or liens on or security interests in the Pre-petition Collateral by a party other than the Debtor must be made within 60 days from the appointment of a Creditors Committees or, if no Committee is appointed, then 90 days from the date of the entry of an Interim Order. If no objection is filed within the time periods specified, the Pre-Petition Obligations shall be deemed valid, enforceable, allowable and unavoidable, and not subject to subordination or recharacterization, and the liens on and security interests in the Pre-Petition Collateral shall be deemed valid, enforceable, unavoidable, perfected and in first priority.

Paragraph 3 of the Stipulation provides that Debtor waives any pre-petition claims against the Senior Secured Parties and related parties (attorneys, accountants, officers, directors, parents, subsidiaries, etc.) arising from the Pre-Petition Loan Documents or the Pre-Petition Obligations. The same paragraph also provides that Debtor agrees to the claim amounts for the Senior Secured Lenders and waives the right to seek reconsideration of the allowance of such claims.

Paragraph 4 provides a general release by Debtor of the Senior Secured Parties pursuant to the provisions of California Civil Code Section 1542

**Relief From Stay Provisions:**

Paragraph 14 of the Stipulation provides a list of "events of default." The events include, but are not limited to: failing to comply with the Stipulation, failing to repay the post-petition financing by the expiration of the Budget Period, withdrawal of the Stalking Horse Bid, a breach of the Lease that provides the Landlord with the right to terminate it, appointment of a trustee or an examiner and failure to meet certain deadlines for entry of an Interim Order, a Final Order or a Sale Procedures Order.

Paragraph 15 of the Stipulation provides the Senior Secured Lenders with certain rights in the event of a default. In addition to relieving the lenders from the obligation to extend further

credit, a default that is not cured within five business days of notice provides the lenders with the right to seek relief from the automatic stay via *ex* parte submission of a declaration as to the default. The Debtor retains the right to challenge the existence of any such alleged default or to seek continued use of Cash Collateral. them with the Interim DIP Order provides that the Secured Lender may seek relief from stay upon shortened notice upon the occurrence of an Event of Default under the DIP Loan Documents.

**Explanation Regarding the Provisions Noted Above;**

With respect to the various provisions/paragraphs discussed above, they were the result of back and forth negotiations between Debtor and the Senior Secured Parties. Debtor conducted due diligence regarding the loans, liens and subordination agreements referenced in the Stipulation. Debtor is not currently aware of claims against the Senior Secured Parties. As set forth in the Stipulation, third-parties will have the opportunity to investigate and challenge the Senior Secured Parties if they deem it appropriate. While the negotiated Carveouts are not significant given the creditor pool in the case, they are a start at setting aside something for other creditors, which Debtor hopes it can supplement with the sale of its IP assets and a plan of reorganization that will utilize its NOLs. Moreover, given the sizeable offer from the Stalking Horse Bidder, which itself was the result of lengthy negotiations, and the possibility for an overbid, Debtor felt it appropriate to make the concessions to move the sale process along.

**BASIS FOR RELIEF REQUESTED**

A. **Statutory Support for the Relief:**

Section 364(c) of the Bankruptcy Code provides that:

If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1) With priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of this title;

(2) Secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) Secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364 (c).

Section 364(d)(1) of the Bankruptcy Code provides that:

The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

    (A)    the [debtor in possession] is unable to obtain such credit otherwise; and

    (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)

Bankruptcy Rule 4001(c)(2) provides, in relevant part, that:

The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Bankruptcy Rule 4001-2(d) provides, in relevant part, that (i) a motion for approval to modify or terminate the automatic stay shall be served on any committee appointed pursuant to section 1102 of the Bankruptcy Code, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and such other entities as the court may direct, and (ii) objections may be filed within 14 days of the mailing of the notice of the motion and the time for filing objections thereto.

Debtor determined that use of Cash Collateral alone was insufficient to operate its business and it needed additional funds to get through the anticipated sale process. It negotiated the transaction at arm's-length, and has determined, in the exercise of its business judgment, that

MOTION FOR APPROVAL OF STIPULATION     16

the proposed financing is the best proposal under the circumstances. Given the debt structure of the company, Debtor did not believe another lender would come forward and advance funds. If such lender did appear, it would have undoubtedly demanded a priming position and the Senior Secured Creditors would not likely have agreed to being primed.

Provided that Debtor's judgment does not run afoul of the provisions of the Bankruptcy Code and its underlying policies, courts grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed Say & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir, 1986); *In re Ames Dep't Stores, Inc*, 115 B.R, 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Curlew Valley Assocs*., 14 B,R, 506, 513-14 (Bankr. D, Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985)

Debtor believes that the terms and conditions of the financing and use of cash collateral are fair and reasonable under the circumstances. Accordingly, Debtor requests that the Secured Lender be afforded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Loan Documents. (See Stipulation at Paragraph 11). Based upon the foregoing, Debtor respectfully requests that the Court approve the proposed financing in accordance with the terms set forth in the Stipulation, related documents and the Proposed Interim DIP Order.

**B. The Use of Cash Collateral Should Be Approved**

Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Debtor requires the use of Cash Collateral to make the adequate protection payments to Secured Lender on account of the Pre-petition Secured Indebtedness.

Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used … or proposed to be used by the trustee, the court, … shall prohibit or

condition such use … as is necessary to provide adequate protection of such interest" 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. See 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis, *See MN Bank Dallas*, *NA. v. O'Conner (In re O'Connor*), 808 F.2d. 1393, 1396 (10th Cir. 1987); *Martin v. US. (In re Martin*), 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re *Swedeland Dev. Group, Inc.*, 16 F. 3d 552, 564 (3d. Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

Debtor contends that the adequate protection proposed herein protecting the Senior Secured Lenders' interest in the Pre-petition Collateral is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

### C. Interim Approval of the DIP Financing

As set forth above, Bankruptcy Rules 4001(b)(2) and (c)(2) provide that a final hearing on a motion to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to debtor's estate.

Debtor respectfully requests that the Court schedule and conduct a preliminary hearing on Motion and authorize Debtor, from the entry of the Interim DIP Order until the Final Hearing, to obtain credit under the terms contained in the DIP Loan Documents.

### D. Establishing Notice Procedures and Scheduling Final Hearing

1. Debtor respectfully requests that the Court schedule the Final Hearing and authorize it to mail and/or fax copies of the signed Interim DIP Order, which fixes the time, date and manner for the filing of objections, to (i) the Initial Notice Parties (as defined below); (ii) any party that has filed prior to such date a request for notices with this Court; (iii) counsel

for any official committee; and (iv) the Securities and Exchange Commission. Debtor requests that the Court consider such notice of the Final Hearing, including without limitation, notice that Debtor will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy Code, to be sufficient notice under Bankruptcy Rule 4001.

**PROPOSED NOTICE TO PARTIES**

Debtor proposes that it be allowed to provide notice of this Motion and the Interim Hearing by first class U.S. mail, electronic mail or fax to the following parties (the "**Initial Notice Parties**"): (a) the Office of the United States Trustee; (b) Debtor's twenty (20) largest unsecured creditors, as identified in its list of twenty largest creditors holding unsecured claims filed along with Debtor's Chapter 11 petition; (c) the Internal Revenue Service; (d) counsel to the Senior Secured Lenders, and (e) all known holders of pre-petition liens against the Debtor's property. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, Debtor respectfully submits that no further notice of this Motion is required.

**CONCLUSION**

WHEREFORE, Debtor respectfully requests that this Court enter the proposed Interim DIP Order, in substantially the form attached hereto as Exhibit A, and grant Debtor the relief requested herein along with such other relief as this Court deems just and proper.

Dated: February 28, 2019  FINESTONE HAYES LLP

By  /s/ Stephen D. Finestone
Stephen D. Finestone.
Attorneys for MUNCHERY INC.

MOTION FOR APPROVAL OF STIPULATION  19