Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
Ryan A. Witthans (301432)
FINESTONE HAYES LLP
456 Montgomery Street, Floor 20
San Francisco, CA 94104
Tel. (415) 421-2624
Fax (415) 398-2820
sfinestone@fhlawllp.com
jhayes@fhlawllp.com

Attorneys for Debtor
Munchery, Inc.

John D. Fiero (136557)
Jason H. Rosell (269126)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Tel: (415) 263-7000
Fax: (415) 263-7010
jfiero@pszjlaw.com
jrosell@pszjlaw.com

Counsel to the Official
Committee of Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>MUNCHERY, INC.,<br><br>Debtor and Debtor-in-Possession. | Case No. 19-30232-HLB<br>Chapter 11<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION TO APPROVE RESTRUCTURING SUPPORT AGREEMENT**<br><br>**Date:** April 9, 2020<br>**Time:** 10:00 a.m<br>**Place:** Courtroom 19<br>450 Golden Gate Ave., Floor 16<br>San Francisco, CA 94102 |

1

Munchery, Inc., ("Munchery" or the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee") file this memorandum of points and authorities in support of their Joint Motion to Approve Restructuring Support Agreement (the "Motion"). The Motion seeks court approval of a Restructuring Support Agreement (the "RSA") by and between the Debtor, the Committee, TriplePoint Venture Growth BDC Corp. ("TriplePoint"), the Putative Class Action Plaintiffs (the "Class"), and Loop Software, Inc. ("Loop"). Debtor, the Committee, TriplePoint, and the Class are referred to below as the "Parties".

## I. BACKGROUND

The Court is well familiar with the case so the background discussion will be brief. The Debtor filed this chapter 11 case on February 28, 2019, after several years of sustained but ultimately unsuccessful efforts to make the company more profitable and positioned for a sale, and a concurrent inability to negotiate terms with its senior secured lenders and several investors to continue financing the company during this process. Ultimately, the company suffered from a number of market and competitive forces and structural deficiencies that led to its inability to develop a long-term sustainable business that could both grow and be profitable – and led to its inability to secure additional financing from existing or new investors and its subsequent closure in January 2019.

At the time of the filing, the Debtor leased a large facility at 220 Shaw Road, South San Francisco (70,000 square feet, 35,000 square feet of useable space), which had valuable improvements and equipment. Debtor assumed and assigned that lease as part of a sale transaction with Gate Gourmet, which closed in late April 2020 and resulted in a recovery to the estate of $5.6 million. Debtor's additional assets are comprised primarily of intangible property, including: (1) software assets owned by the Debtor and generally described as the software for the sale, production, and delivery of prepared meals and meal kits, including the web and mobile e-commerce applications, the "Cookbook" recipe management and production platform, the "pick-and-pack" or "packing" application, the "driver" or "last mile" application, and all related customer care, operations support, and administrative tools (together the "Software Assets"); and (2) data assets, which are generally described as all the customer data, content, and

trademark assets owned by Debtor and generally described as (a) the customer data, including all email and other contact information, transaction history, and customer ratings and reviews; (b) the historical transactional data; (c) the recipe database, including ingredients, nutritional information, preparation instructions, descriptions, and photographs; and (d) the tradename, trademarks, domain names, all written content, videos, and photography assets developed by or owned by Munchery to support the business or the brand (collectively, the "Data and Content Assets"). Debtor engaged in a sales effort for both the Software Assets and the Data and Content Assets, but the results of that effort was disappointing. In consultation with the Committee and TriplePoint, Debtor did not seek approval of any of the offers it received.

Separate from the efforts to maximize a return on the estate's assets, two other matters were ongoing. First, while TriplePoint asserted its lien was secured by all of Debtor's assets, the Committee argued that the lien did not extend to the funds remaining from Debtor's transaction with Gate Gourmet, which totaled approximately $2,300,000. The Committee argued that TriplePoint failed to properly perfect its security interest in the bulk of the assets that were sold as part of the transaction. TriplePoint disputed the Committee's position and the Committee filed an adversary proceeding seeking a determination as to the validity of TriplePoint's lien (the "Lien Litigation"). Second, the Debtor faced ongoing class action litigation with the Class over its claim based upon the federal WARN Act and the California corollary (the "Class Action"). The Class Action asserted that the estate was liable for 60 days' salary to its employees because the Debtor terminated the employees without proper notice. As Debtor had over 250 employees at the time it closed, the potential liability was significant, perhaps as high as $1.6 million. Moreover, given the fact that the claims, if established, would be entitled to priority claim treatment under the bankruptcy law, the Class claims would exhaust any funds that the Debtor might otherwise distribute to junior priority or non-priority creditors. Finally, a vigorous defense of the Class Action would be very expensive, and Debtor did not wish to exhaust estate resources on the litigation if doing so could be avoided.

Subsequently, and in an effort to resolve the outstanding issues in the case and move toward confirmation of a consensual plan, Debtor, the Committee, TriplePoint and the Class

agreed to attend a mediation before the Hon. Roger L. Efremsky.[1] The Parties submitted mediation briefs and had independent calls with Judge Efremsky. The mediation took place on November 22, 2019. A resolution was not reached during the first day, but Judge Efremsky remained in contact with the Parties, and they were eventually able to settle the various issues and allow the case to move forward.

## II. THE RESTRUCTURING SUPPORT AGREEMENT

The various constituents in the Debtor's Chapter 11 case include the Debtor, the Committee, TriplePoint, the Class, and Loop (together, the "Settlement Parties"). The Committee is the official committee of unsecured creditors. TriplePoint is a senior secured lender of the Debtor, having loaned $3,400,000 to the Debtor prepetition as a "secured growth capital loan." The Class is an uncertified class of plaintiffs who sued the Debtor for alleged violations of the federal WARN Act and the California Labor Code. Loop is a Delaware entity formed on October 24, 2019. James Beriker, who is the Chief Executive Officer of the Debtor, is also the Chief Executive Officer of Loop. Following a settlement conference with Judge Roger L. Efremsky on November 22, 2019, the Parties reached a settlement, the terms of which are set forth in RSA dated February 19, 2020, and attached to the Beriker Declaration as **Exhibit A**. The RSA is the product of extensive, good faith, arm's length negotiations and mediation involving multiple parties spanning almost three months. The RSA reflects the heavily negotiated resolution of a number of critical issues among the Parties, and includes the following terms:[2]

- Loop will purchase the Software Assets for the following consideration: (i) $250,000 cash to be paid to TriplePoint; (ii) a promissory note of $250,000 in favor of TriplePoint, which accrues interest at 10% per annum, with the principal and all accrued interest due on the two-year anniversary date of the closing; and (iii) TriplePoint will receive a ten-percent interest in the common shares of Loop on a fully-diluted basis after the closing of Loop's seed financing in the amount of at least $1,000,000 (the "Loop Financing") (collectively, the total consideration is defined as the "Software Consideration"). The Software Assets will be sold by the Debtor

---

[1] An additional group, referenced as the Vive creditors, attended the mediation but were dismissed shortly after the mediation began.

[2] The summary of terms is not intended to be a complete recitation of all terms of the RSA and any inference drawn from the omission of a term in the RSA would be unwarranted. In the event of any discrepancy between the Motion and the RSA, the RSA shall control.

4

pursuant to the Debtor's plan of liquidation, with the Software Consideration distributed to TriplePoint pursuant to the plan; provided, however, that if the Loop Financing is ready to close at least thirty days prior to the scheduled date of the confirmation hearing, the Debtor shall abandon the Software Assets and stipulate to relief with TriplePoint to effectuate the sale of the Software Assets. The purchase and sale of the Software Assets is conditioned upon the closing of the Loop Financing.

- The Debtor's plan of liquidation shall provide that the Data and Content Assets will be abandoned on the plan's effective date, unless otherwise sold prior to the effective date of the plan by mutual agreement of the Debtor, the Committee, and TriplePoint. Neither the plan nor the abandonment of the Data and Content Assets shall in any way affect the priority, validity, or enforcement of TriplePoint's liens with respect to the Data and Content Assets. Debtor anticipates that TriplePoint will attempt to finalize a sale of the Data and Content Assets, but Debtor and the Committee do not believe the consideration for those assets will be greater than $50,000 and could be less.

- The Debtor's plan of liquidation shall provide that TriplePoint receives (i) the Software Consideration (unless the Software Assets have already been sold to Loop as set forth above; (ii) an allowed secured claim against the Debtor's non-IP assets (essentially cash in the estate) in the amount of $1,000,000 in full satisfaction of its secured claim against the Debtor's bankruptcy estate (the "TriplePoint Allowed Non-IP Claim"); and (iii) the abandoned Data and Content Assets. TriplePoint must vote to support confirmation of a chapter 11 plan of liquidation that provides for the prompt payment to TriplePoint of the TriplePoint Allowed Non-IP Claim and the Software Consideration (if necessary) in full. To the extent the plan is not confirmed, the TriplePoint Allowed Non-IP Claim shall not be binding on any party.

- The Lien Litigation (Adv. Proc. No. 19-03048) shall be stayed for all purposes, including discovery, pending confirmation of a chapter 11 plan and will be dismissed with prejudice upon the effective date of a confirmed plan of liquidation.

- The Class will receive in full satisfaction of its claims: (i) $400,000 to be paid as a priority claim pursuant to section 507(a)(4) of the Bankruptcy Code; and (ii) 50% of any "Excess Funds" (together, the "Class Payment"), which are defined as any remaining cash of the estate after payment of all administrative claims, secured claims, priority claims, PACA claims, and the "GUC Proceeds", which are defined as at least $120,000 to be transferred to a liquidation trust for the benefit of unsecured creditors. The Class shall bear all responsibility and associated costs of drafting and filing all required pleadings with the U.S. District Court in connection with the settlement and shall bear all costs of providing notice with respect to the settlement. The Class Payment is in exchange for a full waiver and release of all claims by the Class plaintiffs and a waiver and release of all claims of the members of the Class against the Debtor's estate. Upon execution of the RSA, the Class shall file a class proof of claim in the Debtor's bankruptcy case, reflecting the terms of the settlement. The Class shall not object to the Debtor's liquidation plan, provided that such plan proposes to pay the Class Payment in full upon the plan's effective date.

- The chapter 11 plan of liquidation shall establish a liquidation trust for the benefit of general unsecured creditors. The liquidation trustee shall be selected solely by the Committee. All remaining assets of the Debtor shall be vested in the liquidation trust. As a condition precedent to the effective date of the chapter 11 plan, at least $120,000 shall be available to be transferred to the liquidation trust for the benefit of general unsecured creditors. In addition to the $120,000, the unsecured creditors shall receive 50% of the Excess Funds.

- There are no automatic termination events in the RSA. Rather, upon the occurrence of specified events, as set forth in the RSA, the RSA is subject to termination upon five business days' written notice to the Parties by TriplePoint, the Debtor, or the Committee. The RSA may also be terminated upon mutual written agreement by the Parties.

### III. LEGAL ARGUMENT

The RSA is a comprehensive settlement resulting from extensive, good faith negotiations and a settlement conference by and between the Parties. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Bankruptcy Local Rule 5011-1(a). The Motion is core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B), (G), (K), (M), (N), and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**A. Approval of the RSA is Warranted by Bankruptcy Code Sections 363(b) and 105(a)**

The Bankruptcy Code provides authority for the Court to approve Debtor's entry into, and performance under, the RSA. Specifically, section 363(b) provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) further provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Together, these sections of the Bankruptcy Code provide the Court with authority to grant the relief requested in the Motion. *In re Walter*, 83 B.R. 14, 17 (9th Cir. BAP 1988) ("The bankruptcy court has considerable discretion in deciding whether to approve or disapprove the use of estate property by a debtor in possession, in the light of sound business justification."); *In re Kaplan*, 2015 LEXIS 1916 at *4-5 (Bankr. C.D. Cal. 2015); *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion."). Once a debtor articulates a valid business justification under section

6

363, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief that the action was in the debtor's best interest. *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (citation omitted).

In approving plan support agreements such as the RSA, courts have relied on sections 363(b) and 105(a), finding that such relief is consistent with those sections of the Bankruptcy Code. *E.g.*, *In re Pacific Gas and Electric Co.*, Case No. 19-30088 (Bankr. N.D. Cal. Dec. 17, 2019) [Docket Order] (order approving restructuring support agreement); *In re Pacific Gas and Electric Co.*, Case No. 01-30923 (Bankr. N.D. Cal. March 27, 2002) [Docket No. 5558] (order approving proposed settlement of approximately $2 billion in asserted unsecured claims against the debtor as part of a plan support agreement); *In re TK Holdings Inc.*, Case No. 17-11375 (Bankr. D. Del. Dec. 13, 2017) [Docket No. 1359] (order approving postpetition plan support agreement); *In re Exide Techs*, Case No. 13-11482 (Bankr. D. Del. Feb. 4, 2015) [Docket No. 3987] (same); *In re Tronox, Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Dec. 23, 2009) [Docket No. 1030] (same).

The RSA is the product of arm's length, extended, good faith negotiations and a formal settlement conference held by Judge Roger Efremsky. This process was successful in resolving unliquidated and contested liabilities that are critical to the successful resolution of the Debtor's chapter 11 case. Based on the RSA, the Debtor anticipates that its liquidating plan will now be consensual.

If the RSA is not approved, the case will be converted to a Chapter 7, a trustee will need to investigate and attempt to resolve the disputes with TriplePoint and the Class, and there will be further delays and no guarantee of a return to the Parties.

**B. Approval of the RSA is Warranted Under Federal Rule of Bankruptcy Procedure 9019**

The Debtor and the Committee believe that the RSA and compromise described above and therein is in the best interests of the estate and meets the standards of *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986); *cert. den. sub nom Martin v. Robinson*, 479 U.S. 854 (1986). Approval or rejection of a compromise is within the court's discretion. In

7

considering the approval of a proposed compromise, the court must consider the following factors:

1. The probability of success in the litigation;
2. The difficulty, if any, to be encountered in collection;
3. The complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it; and
4. The paramount interest of creditors and a proper deference to their reasonable views.

For the reasons stated below, the Debtor and the Committee believe that settlement fulfills the *A&C Properties* factors.

### 1. *Probability of Success*

This factor favors settlement. In the context of this Chapter 11 bankruptcy case, "success" is defined as a consensual chapter 11 plan. The creation of a liquidating trust for the benefit of general unsecured creditors, as set forth in the RSA, is projected to result in a meaningful distribution to the estate's unsecured creditors after payment of the estate's administrative expenses, secured claims and priority creditors. The alternative is for the Committee to litigate Lien Litigation, for the Debtor to litigate the Class Action (or default the litigation), hope that the outcome of the litigation will justify the considerable expense, and hope that some other party may still be willing to buy the Software Assets and Data and Content Assets. Alternatively, the Debtor could convert the case to a Chapter 7 and let a Chapter 7 trustee wrestle with the same issues and problems. Either ongoing litigation or a conversion would be accompanied by significant expense, delay, and the risk that the outcome of the litigation and the collected assets would not be enough to make the same distributions provided for in the RSA, if any at all. Moreover, Debtor and the Committee believe that the potential outcomes of the Lien Litigation and the Class Action are uncertain and could certainly be worse than the terms of the RSA.

### 2. *Difficulty of Collection*

This factor does not apply. Absent the RSA, the parties will be returned to their pre-settlement rights, and will continue the litigation of their disputes.

### 3. *Complexity of Litigation, Expense, Inconvenience, and Delay*

This factor favors settlement. The Debtor and the Committee believe that the RSA is simpler, surer, and considerably less expensive than the alternative of attempting to find a buyer who could derive value from the estate's remaining assets. By eliminating the need to find such a buyer, the estate avoids significant expense, delay, and risk to creditors. In terms of the Lien Litigation and Class Action, both would be complicated and costly to litigate. The Lien Litigation primarily involves a dispute over whether the TriplePoint security interest extends to the assets sold to Gate Gourmet. This is not a simple question, as those assets include rights in a lease, hard assets such as equipment, and fixtures constructed at Debtor's premises. The Committee could prevail on the challenge to TriplePoint's security interest, but TriplePoint is well represented and could also prevail in the case. As discussed above, litigating the Class Action would be costly and based on the research to date, the outcome is at best uncertain. While Debtor had reasons for its sudden closure, which closure was the triggering event for the Class claims, those reasons may not be sufficient as a defense to the provisions of the WARN Act and its California equivalent. Debtor's research suggests that the Class may have the better of the argument.

### 4. *Paramount Interest of Creditors*

This factor favors settlement. The Debtor and the Committee believe that the fulfillment of the terms of the RSA will result in a distribution to the estate's creditors. Without the RSA, the estate could become administratively insolvent.

## IV. WAIVER OF RULE 6004(h)

The Debtor and the Committee request that the order approving the RSA and compromise provides: "This Order is effective upon entry, and the stay otherwise imposed by Rule 62(a) of the Federal Rules of Civil Procedure and/or Bankruptcy Rule 6004(h) shall not apply."

## V. CONCLUSION

For the reasons stated above, Munchery and the Committee request that the Court enter an order (1) granting the Joint Motion to Approve Restructuring Support Agreement; (2)

providing that the Order is effective upon entry, and that the stay otherwise imposed by Rule 62(a) of the Federal Rules of Civil Procedure and/or Bankruptcy Rule 6004(h) shall not apply; (3) authorizing Munchery and the Committee to take the steps they deem necessary to implement the order without further Court order; and (4) allowing such other relief as the Court deems proper.

Dated March 16, 2020

**FINESTONE HAYES LLP**

/s/ Jennifer C. Hayes

Jennifer C. Hayes
Attorneys for Munchery, Inc.

**PACHULSKI STANG ZIEHL AND JONES**

/s/ Jason H. Rosell

Jason H. Rosell
Attorneys for Official Committee of Unsecured Creditors