**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: | Case No. 19-30232 (HLB) |
| MUNCHERY, INC., | Chapter 11 |
| Debtor. | **FIRST AMENDED JOINTLY PROPOSED COMBINED CHAPTER 11 PLAN OF LIQUIDATION AND TENTATIVELY APPROVED DISCLOSURE STATEMENT DATED AS OF JUNE 10, 2020** |

## INTRODUCTION

This is the *First Amended Jointly Proposed Combined Chapter 11 Plan of Liquidation and Disclosure Statement* (the "Plan"), which is being proposed by Munchery, Inc. (the "Debtor") and the Official Committee of Unsecured Creditors of the Debtor (the "Committee") in the above-captioned chapter 11 case (the "Chapter 11 Case") pending before the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "Bankruptcy Court"). The Plan identifies the classes of creditors and describes how each class will be treated if the Plan is confirmed. The treatment of many of the classes of creditors is intended to be consistent with a Restructuring Support Plan and Term Sheet (the "Settlement Term Sheet"), which was previously approved by the Bankruptcy Court.

Part 1 contains the treatment of secured claims.

Part 2 contains the treatment of general unsecured claims.

Part 3 contains the treatment of administrative and priority claims.

Part 4 contains the treatment of executory contracts and unexpired leases.

Part 5 contains the effect of confirmation of the Plan.

Part 6 contains creditor remedies if the Debtor defaults on its obligations under the Plan.

Part 7 contains general provisions of the Plan.

Creditors in impaired classes are entitled to vote on confirmation of the Plan. Completed ballots must be received by counsel to the Debtor, and objections to confirmation must be filed and served, no later than August 7, 2020 at 5:00 p.m. (Pacific Time). The court will hold a hearing on confirmation of the Plan on August 20, 2020 at 10:00 a.m. (Pacific Time).

Combined Plan & Disclosure Statement of Munchery, Inc.

Attached to the Plan are exhibits containing financial information that may help you decide how to vote and whether to object to confirmation of the Plan. Exhibit 1 includes background information regarding Debtor and the events that led to the filing of the bankruptcy petition and describes significant events that have occurred during the Chapter 11 Case. Exhibit 2 contains an analysis of how much creditors would likely receive in a chapter 7 liquidation. Exhibit 3, which typically provides information on Debtor's income and expenses is left blank because the Debtor is not operating. Exhibit 4 describes the source of the payments required under the Plan.

Whether the Plan is confirmed is subject to complex legal rules that cannot be fully described here. You are strongly encouraged to read the Plan carefully and to consult an attorney to help you determine how to vote and whether to object to confirmation of the Plan.

If the Plan is confirmed, the payments promised in the Plan constitute new contractual obligations that replace the Debtor's pre-confirmation debts. Creditors may not seize their collateral or enforce their pre-confirmation debts so long as the Debtor performs all obligations under the Plan. If the Debtor defaults in performing Plan obligations, any creditor can file a motion to have the case dismissed or converted to a chapter 7 liquidation or enforce their non-bankruptcy rights.

Upon confirmation of the Plan, the Plan shall be administered by the Debtor's former Chief Executive Officer, James Beriker (the "Plan Administrator"), who will be responsible for, among other things, making all distributions to creditors under the Plan. The Plan Administrator will be subject to the supervision of an oversight committee (the "Oversight Committee"), whose sole member shall be Brad Boe, the Chair of the Committee. The Plan Administrator and the Oversight Committee shall have no liability whatsoever for any acts or omissions in their capacities as Plan Administrator and the Oversight Committee to any parties to the Plan, including without limitation holders of Claims against or Equity Interests in the Company other than for fraud, gross negligence or wilful misconduct.

**PART 1:      TREATMENT OF SECURED CREDITORS**

**Class 1 – TPVG Secured Claim**

| Class | Name of Creditor | Description of Collateral |
|-------|------------------|---------------------------|
| 1 | TriplePoint Venture Growth BDC Corp | Cash in the estate and Debtor's intellectual property as described below |

The Debtor owns assets generally described as (a) the customer data, including all email and other contact information, transaction history, and customer ratings and reviews; (b) the historical transactional data; (c) the recipe database, including ingredients, nutritional information, preparation instructions, descriptions, and photographs; and (d) the tradename, trademarks, domain names, all written content, videos, and photography assets developed by or owned by Munchery to support the business or the brand (collectively, the "Data and Content Assets").

Combined Plan & Disclosure Statement of Munchery, Inc.

Debtor anticipates that the Data and Content Assets will be sold to Rolliyo, Inc. prior to confirmation of the Plan for $60,000.00. The proceeds of such sale will be divided between TriplePoint Venture Growth BDC Corp. ("TPVG") (66.7%) and the Debtor's estate (33.3%). If the sale of the Data and Content Assets has not been accomplished prior to confirmation of the Plan, then the sale will be accomplished as part of the Plan consistent with the provisions of the Asset Purchase Agreement entered into on June 4, 2020 between the Debtor and Rolliyo, Inc.

Rolliyo, Inc. is an entity wholly owned and controlled by James Beriker, the Debtor's former President & CEO.

The Debtor owns additional assets generally described as the software for the sale, production, and delivery of prepared meals and meal kits, including the web and mobile e-commerce applications, the "Cookbook" recipe management and production platform, the "pick-and-pack" or "packing" application, the "driver" or "last mile" application, and all related customer care, operations support, and administrative tools (together the "Software Assets"). The Software Assets are subject to a first priority secured lien in favor of TPVG, securing an indebtedness of approximately $3,400,000. In connection with confirmation of the Plan, the Debtor shall either sell the Software Assets to Loop Software, Inc. ("Loop") or abandon the Software Assets to TPVG. Regardless of whether the Debtor sells the Software Assets to Loop or abandons the Software Assets to TPVG, there will be no effect on the Debtor's estate, the Plan, and the treatment of creditors.

Pursuant to the proposed terms of the sale of the Software Assets to Loop, Loop will: (i) pay TPVG $250,000; (ii) execute a two-year promissory note (the "Loop Note") in favor of TPVG in the amount of $250,000 at 10% interest; and (iii) issue 10% of the common shares of Loop to TPVG on a fully-diluted basis after the closing of Loop's seed financing. In the event that Loop is not ready to close the sale transaction for the Software Assets prior to the Effective Date, the Software Assets shall be deemed abandoned to TPVG.

Loop Software, Inc. is an entity wholly owned and controlled by James Beriker, the Debtor's former President & CEO.

Debtor shall pay TPVG $1,000,000 from the estate upon the Effective Date. Other than the treatment outlined above, TPVG will receive no other consideration from the Debtor or the estate and, upon the later of the Effective Date or the payment of the $1,000,000, TPVG shall be deemed to have released any security interest it has in any other assets of the Debtor.

In addition to the treatment outlined above, on the Effective Date the adversary proceeding against TPVG pending before the Bankruptcy Court (Adversary Proceeding No. 19-03048) shall be deemed dismissed with prejudice without further order of the Bankruptcy Court.

**Holders of Class 1 Claims are impaired and entitled to vote on the Plan.**

Combined Plan & Disclosure Statement of Munchery, Inc.

**PART 2:     TREATMENT OF UNSECURED CLAIMS, CERTAIN PRIORITY CLAIMS AND EQUITY INTERESTS**

**Class 2 – General Unsecured Claims**

| Class | Name of Creditors | Description of Collateral |
|-------|-------------------|---------------------------|
| 2 | Holders of General Unsecured Claims | None |

Holders of allowed general unsecured claims ("Class 2 Claims"), which includes claims arising from executory contracts and unexpired leases that are being rejected under the Plan, shall be paid as follows:

Pot Plan. All remaining assets of the Debtor not disposed of by this Plan shall be vested in the Debtor for the benefit of holders of Class 2 Claims. As a condition precedent to the effective date of the Plan, at least $120,000 shall be available to be distributed to holders of Class 2 Claims (the "GUC Proceeds"). For the avoidance of doubt, the GUC Proceeds are net of any reserves for administrative claims and priority claims.  In addition to the GUC Proceeds, 50% of any Excess Funds shall also be vested in the Debtor for the benefit of holders of Class 2 Claims. For the avoidance of doubt, such Excess Funds shall constitute GUC Proceeds. The Plan Administrator shall distribute the GUC Proceeds *pro rata* to holders of Class 2 Claims; *provided*, *however*, that the Plan Administrator shall not be required to make a distribution to any creditor on account of an allowed Class 2 Claim if the distribution would be less than $100, the purpose of which is to save administrative expenses and make the distribution of the GUC Proceeds feasible to administer. The Debtor and the Committee believe that this minimum distribution threshold will affect holders of claims with a face amount of less than $10,000, including all holders of gift cards and gift certificates.

The Debtor and the Committee anticipate that distributions to holders of Class 2 Claims will be made within 90 days of confirmation of the Plan.

Waiver of Avoidance Actions.  On the Effective Date, any and all pending or possible actions, proceedings, accounts, controversies, agreements, promises, claims and rights of the Debtor arising under chapter 5 of the Bankruptcy Code or under related state or federal statutes and common law, whether or not litigation has been commenced with respect to such cause of action, as of the Effective Date, shall be deemed waived with respect to non-insider holders of allowed Class 2 Claims.

Vesting and Transfer of Remaining Assets.  Pursuant to section 1141(b) of the Bankruptcy Code, all of the Debtor's remaining assets existing as of the Effective Date (the "Remnant Assets") shall vest in the Debtor; *provided*, *however*, that the Plan Administrator may abandon or otherwise not accept, with the consent of the Oversight Committee, any Remnant Asset that the Plan Administrator believes, in good faith, has no meaningful value; *provided*, *however*, that pursuant to an order of the Bankruptcy Court following proper notice, the Plan Administrator, with the consent of the Oversight Committee, may abandon any Remnant Assets to any person.

On the Effective Date, the Plan Administrator shall (i) take possession, custody, and control of all books, records, and files of the Debtor and its estate; and (ii) provide for the retention and storage of such books, records, and files until such time as the Plan Administrator determines, in consultation with the Oversight Committee, that retention of same is no longer necessary or required.

As of the Effective Date, all Remnant Assets vested, and all other assets dealt with in the Plan, shall be free and clear of all claims, liens, and interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

The Plan Administrator shall be responsible for reconciling and paying all claims in accordance with the Plan, including, but not limited to, Class 2 Claims, administrative claims, and priority claims; *provided*, *however*, the Class 3 Claims shall be administered through Class Counsel.

Holders of Class 2 Claims may not take any collection action against the Debtor so long as Debtor is not in material default under the Plan.

**Holders of Class 2 Claims are impaired and entitled to vote on the Plan.**

## Class 3 – WARN ACT PRIORITY CLAIMS

| Class | Name of Creditors | Description of Collateral |
|-------|-------------------|---------------------------|
| 3 | Holders of WARN ACT Claims | None |

Class 3 consists of all claims (the "Class 3 Claims") held by potential class members (the "WARN Class") in the case pending before the United States District Court for the Northern District of California (the "District Court"), *Phillips et al. v. Munchery, Inc.*, Case No. 19-00469 (the "WARN Action"). Pursuant to the Settlement Term Sheet, in full satisfaction of all claims held by potential class members, counsel to the WARN Class (the "WARN Counsel") shall receive on behalf of the WARN Class (i) $400,000 as soon as reasonably practicable after the Effective Date and (ii) 50% of any Excess Funds (together, the "WARN Payment").

"Excess Funds" shall mean any remaining cash of the estate after payment of all administrative claims, secured claims, priority claims, and the GUC Proceeds. The WARN Payment shall be in exchange for a full waiver and release of all claims of the WARN Class, and a waiver and release of all claims of the members of the WARN Class against the Debtor's estate arising from the facts alleged in the WARN Action, including, but not limited to, any administrative, priority, and general unsecured claims.

The WARN Payment shall be made to WARN Counsel and any and all expenses or taxes related to the payment shall be made from the WARN Payment and shall be the responsibility of the WARN Class. The Debtor and the WARN Counsel shall cooperate with respect to any steps

Combined Plan & Disclosure Statement of Munchery, Inc.

required in the WARN Action necessary to obtain approval of or to facilitate the Plan's treatment of the WARN Class pursuant to the terms of the Settlement Term Sheet and this Plan; *provided*, *however*, that the WARN Class shall bear all responsibility and associated costs of drafting and filing all required pleadings with the District Court in connection with this cooperation, including without limitation, obtaining (i) certification of the WARN Class for settlement, (ii) approval of the forms of notices, and (iii) obtaining approval of the terms of the WARN Class settlement set forth herein and in the Settlement Term Sheet. The WARN Class shall also bear all cost of providing any required notices with respect to such settlement.

**Holders of Class 3 Claims are unimpaired and not entitled to vote on the Plan.**

**Class 4 – Equity Interests**

| Class | Name of Creditors | Description of Collateral |
|-------|------------------|--------------------------|
| 4 | Holders of Equity Interests in the Debtor | None |

Class 4 consists of all equity interests in the Debtor. The holders of equity interests in the Debtor will not receive any distributions under the Plan on account of their interests and as such, are not entitled to vote on the Plan and are deemed to reject the Plan. Their stock, however, will not be cancelled and holders will retain their interest and will otherwise retain the legal, equitable, and contractual rights provided by their interests.

**PART 3: TREATMENT OF ADMINISTRATIVE AND PRIORITY CLAIMS**

The following section of the Plan discusses the treatment of administrative and priority claims. For the avoidance of doubt, all allowed administrative and priority claims will be paid in full and are not considered separate "classes" for purposes of voting on the Plan. Accordingly, holders of administrative and priority claims are not entitled to vote on the Plan and will not receive a ballot.

**Professional Fees**

The Plan Administrator shall be James Beriker, the former Chief Executive Officer of the Debtor. The Plan Administrator will pay the following professional fees in full on the Effective Date, or upon approval by the Bankruptcy Court, whichever is later, or such other treatment as agreed to by the professional, Plan Administrator, and Oversight Committee. The Oversight Committee shall consist of at least one member of the Committee. Initially, Brad Boe of Performance Food Group, the Chair of the Committee, shall act as the sole member of the Oversight Committee.

| Name and Role of Professional | Estimated Amount |
|------------------------------|------------------|
| Finestone Hayes LLP – Debtor's Counsel | $160,000 |

Combined Plan & Disclosure Statement of Munchery, Inc.

| | |
|---|---|
| Pachulski Stang Ziehl & Jones LLP – Committee Counsel | $260,000 |
| Omni Management – Servicing Agent | $6,000 |
| Armanino LLP – Financial Advisor to the Debtor | $5,000 |
| **TOTAL:** | **$431,000.00** |

**Other Administrative Claims**

       The Plan Administrator will pay other allowed claims entitled to priority under section 503(b) in full on the Effective Date; except expenses incurred in the ordinary course of the Debtor's business or financial affairs, which shall be paid when normally due and payable (these creditors are not listed below). All fees payable to the United States Trustee as of the Effective Date will be paid on the Effective Date; post-confirmation fees to the United States Trustee will be paid when due in full.

| Name of Administrative Creditor | Estimated Amount of Claim |
|---|---|
| TableArt, Inc. | $13,714.30 |
| Employment Development Dept. | Claim is valued at $14,497. The EDD filed a second admin claim for $40,006 for unemployment taxes allegedly due for the period of July 1, 2019 through Dec. 31, 2019. Debtor had no employees during that period and will object to the claim prior to confirmation |

**Tax Claims**

       The Plan Administrator will pay allowed claims entitled to priority under section 507(a)(8) in full on the Effective Date or within 14 days of such claim being determined to be an allowed claim in the event there is a dispute as to the amount of any priority claim.

| Name of Creditor | Estimated Amount of Claim | Statutory Interest Rate | Payment Amount | Notes |
|---|---|---|---|---|
| Calif. Dept. of Tax and Fee | $126,377 | | In full | Claim was based upon an estimate for Q3 2018, which amount Debtor disputes. |

Combined Plan & Disclosure Statement of Munchery, Inc.

| Name of Creditor | Estimated Amount of Claim | Statutory Interest Rate | Payment Amount | Notes |
|---|---|---|---|---|
| Internal Revenue Service | $4,031 | | In full | IRS filed a claim for $291,158, which is subject to a pending objection |
| Los Angeles County | $43,222 | | In full | |
| San Mateo County | $47,847 | | In full | Debtor contends the amount should be $0 as the claim appears to be a real property tax bill for which the Debtor is not liable. If any amount is due it is no more than $40,679, as the balance includes penalties. |
| California Franchise Tax Board | $835 | | In full | |

**PART 4:        EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

On the Effective Date, all agreements executed by the Debtor before the Effective Date, other than agreements that were previously either assumed and assigned or rejected by a final order of the Bankruptcy Court, to the extent that these agreements constitute executory contracts or unexpired leases under section 365 of the Bankruptcy Code, shall be rejected.  The Confirmation Order shall constitute a final order under section 365 of the Bankruptcy Code approving such rejection.

Bar Date for Rejection Damage Claims.  Any claims arising from rejection under the Plan of an executory contract or unexpired lease ("Rejection Damage Claims") must be filed with the Bankruptcy Court and served on the Plan Administrator and his counsel within thirty (30) days after the Effective Date.  Any Rejection Damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtor and its estate and the entities holding such late-filed claims will be barred from receiving any distributions under the Plan on account of their Rejection Damage Claims. The Plan Administrator shall have the right to object to any such Rejection Damage Claims; *provided*, *however*, that any such objections must be served and filed not later than 180 days after the Effective Date, absent further order of the Bankruptcy Court.

**PART 5:        DISCHARGE AND OTHER EFFECTS OF CONFIRMATION**

Combined Plan & Disclosure Statement of Munchery, Inc.

(a)     Discharge.  Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtor shall not receive a discharge of its debts.

(b)     Vesting of Property.  On the Effective Date, all property of the estate and interests of the Debtor will re-vest in the Debtor free and clear of all claims and interests except as provided in this Plan.

(c)     Plan Creates New Obligations.  Except as provided in Part 6(d) below, the obligations to creditors that the Debtor undertakes in the Plan replace those obligations to creditors that existed prior to the Effective Date of the Plan.  Debtor's obligations under the confirmed Plan constitute binding contractual promises that, if not satisfied through performance of the Plan, create a basis for an action for breach of contract under California law.  To the extent a creditor retains a lien under the Plan, that creditor retains all rights provided by such lien under applicable non-bankruptcy law.

## PART 6:     REMEDIES IF DEBTOR DEFAULTS IN PERFORMING THE PLAN

(a)     Creditor Action Restrained.  The confirmed Plan is binding on every creditor whose claims are provided for in the Plan.  Therefore, even though the automatic stay terminates on the Effective Date with respect to secured claims, no creditor may take any action to enforce either the pre-confirmation obligation or the obligation due under the Plan, so long as Debtor is not in default under the Plan, except as provided in Part 6(f) below.

(b)     Obligations to Each Class Separate.  The Debtor's and Plan Administrator's obligations under the Plan are separate with respect to each class of creditors.  Default in performance of an obligation due to members of one class shall not by itself constitute a default with respect to members of other classes.  For purposes of this Part 6, the holders of all administrative claims shall be considered to be a single class, the holders of all priority claims shall be considered to be a single class, and each non-debtor party to an assumed executory contract or lease shall be considered to be a separate class.

(c)     Material Default Defined.  If the Debtor or Plan Administrator fails to make any payment, or to perform any other obligation required under the Plan, for more than 14 days after the time specified in the Plan for such payment or other performance, any member of a class affected by the default may serve upon counsel to the Debtor and the Committee, a written notice of the default.  If, within 30 days after the date of service of the notice of default, the Debtor or the Plan Administrator fails either: (i) to cure the default; (ii) to obtain from the Bankruptcy Court an extension of time to cure the default;  or (iii) to obtain from the Bankruptcy Court a determination that no default occurred, then Debtor and the Plan Administrator are in Material Default under the Plan to all of the members of the affected class.

(d)     Remedies Upon Material Default.  Upon a Material Default, any member of a class affected by the default: (i) may file and serve a motion to dismiss the case or to convert the case to chapter 7 of the Bankruptcy Code; or (ii) without further order of the Bankruptcy Court, has relief from the stay to the extent necessary, and may pursue its lawful remedies to enforce and

Combined Plan & Disclosure Statement of Munchery, Inc.

collect Debtor's pre-confirmation obligations.

(e)     Claims not Affected by Plan.  Upon confirmation of the Plan, and subject to Part 5(c), any creditor whose claims are left unimpaired under the Plan may, notwithstanding paragraphs (a)-(d) above, immediately exercise all of its contractual, legal, and equitable rights, except rights based on default of the type that need not be cured under section 1124(2)(A) and (D).

(f)     Effect of Conversion to Chapter 7.  If the Chapter 11 Case is at any time converted to one under chapter 7 of the Bankruptcy Code, the property of the Debtor shall vest in the chapter 7 bankruptcy estate.

(g)     Retention of Jurisdiction.  The Bankruptcy Court may exercise jurisdiction over proceedings concerning: (i) whether the Debtor is in Material Default of any Plan obligation; (ii) whether the time for performing any Plan obligation should be extended; (iii) adversary proceedings and contested matters pending  in the Bankruptcy Court as of the Effective Date or specifically contemplated in this Plan to be filed in the Bankruptcy Court; (iv) whether the Chapter 11 Case should be dismissed or converted to one under chapter 7 of the Bankruptcy Code; (v) any objections to claims; (vi) compromises of controversies under Rule 9019 of the Federal Rules of Bankruptcy Procedure; (vii) compensation of professionals; and (viii) other questions regarding the interpretation and enforcement of the Plan.

## PART 7:     GENERAL PROVISIONS

(a)     Effective Date of Plan.  The Effective Date of the Plan is the fifteenth (15th) day following the date of the entry of the order of confirmation of the Plan if no notice of appeal from that order has been filed.  If a notice of appeal has been filed, the Debtor may waive the finality requirement, with the consent of the Oversight Committee, and put the Plan into effect, unless the order confirming the Plan has been stayed.  If a stay of the confirmation order has been issued, the Effective Date will be the first day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

(b)     Disputed Claim Reserve.  The Plan Administrator will create a reserve for disputed claims.  Each time the Plan Administrator makes a distribution to the holders of allowed claims, the Plan Administrator will place into a reserve the amount that would have been distributed to the holders of disputed claims if such claims had been allowed in the full amount claimed.  If a disputed claim becomes an allowed claim, the Plan Administrator shall immediately distribute to the claimant from the reserve an amount equal to all distributions due to date under the Plan calculated using the amount of the allowed claim.  Any funds no longer needed in reserve shall be distributed pro-rata among allowed claims in the applicable class.

(c)     Cramdown.  Pursuant to section 1129(b) of the Bankruptcy Code, the Debtor and the Committee reserve the right to seek confirmation of the Plan despite the rejection of the Plan by one or more classes of creditors.

(d)     Implementation of the Plan. The Plan Administrator will be appointed upon entry

Combined Plan & Disclosure Statement of Munchery, Inc.

of the Confirmation Order and the Plan Administrator shall be responsible for making all disbursements under the Plan.

(e) <u>Oversight Committee</u>. The Oversight Committee will come into being upon entry of the Confirmation Order. In exchange for their services related to administering the Plan and supervising the Plan Administrator, each member of the Oversight Committee shall be compensated at a flat monthly fee of $2,500, which shall be paid on the Effective Date and the first business day of every month thereafter.

(f) <u>Plan Administrator</u>. The Plan Administrator will come into being upon entry of the Confirmation Order. In exchange for his services related to administering the Plan, the Plan Administrator shall not receive any monetary compensation, but the company shall continue to pay his health insurance policy premium of approximately $4,000 per month through August 2020.

(g) <u>Severability</u>. If any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

(h) <u>Governing Law</u>. Except to the extent a federal rule of decision or procedure applies, the laws of the State of California govern the Plan.

(i) <u>Lawsuits</u>. The Debtor and the Committee are not currently aware the existence of any causes of action for fraudulent transfers, voidable preferences, or other claims, but it is anticipated that the Plan Administrator, in consultation with the Oversight Committee, will further investigate this and determine whether such actions exist and should be pursued.

(j) <u>Retained Claims</u>. Except as otherwise provided in the Plan, or in any contract, instrument, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator, with the consent of the Oversight Committee, shall retain and may enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss all claims, rights, causes of action, suits, and proceedings, including but limited to, claims pursuant to chapter 5 of the Bankruptcy Code (other than chapter 5 claims waived herein), claims against a subtenant or counterparty to any contract or lease with the Debtor for which there has been non-performance or a breach, and claims under pending class action proceedings against Visa or other creditor card companies related to the processing of credit card transactions. For the avoidance of doubt, any settlement or compromise of any claims shall require the consent of the Oversight Committee.

(k) <u>Notices</u>. Any notice to the Debtor, Plan Administrator, and/or the Committee or shall be in writing, and will be deemed to have been given three days after the date sent by first-class mail, postage prepaid and addressed as follows:

**Debtor or Plan Administrator:**

Munchery, Inc,

Combined Plan & Disclosure Statement of Munchery, Inc.

c/o Stephen D. Finestone
Finestone Hayes LLP
456 Montgomery St., 20th Floor
San Francisco, CA 94104
Email: sfinestone@fhlawllp.com

**The Official Committee of Unsecured Creditors:**

Pachulski Stang Ziehl & Jones LLP
Attention: Jason H. Rosell
150 California St, 15th Floor
San Francisco, CA 94111
Email: jrosell@pszjlaw.com

   /s/ James Beriker
Debtor

  /s/ Stephen D. Finestone
Attorney for Debtor

 /s/ Jason H. Rosell
Attorney for Committee

Combined Plan & Disclosure Statement of Munchery, Inc.

**Attorney Certification**

I, Stephen D. Finestone, am legal counsel for the Debtor in the above-captioned case and hereby certify the following: (i) the foregoing plan is a true and correct copy of the Chapter 11 Combined Plan and Disclosure Statement promulgated by the Northern District of California, San Francisco Division, on December 7, 2011 (the "Standard-Form Plan"); and (ii) except as specified below, there have been no alterations or modifications to any provision of the Standard-Form Plan.

I, Jason H. Rosell, am legal counsel for the Committee in the above-captioned case and hereby certify the following: (i) the foregoing plan is a true and correct copy of the Chapter 11 Combined Plan and Disclosure Statement promulgated by the Northern District of California, San Francisco Division, on December 7, 2011 (the "Standard-Form Plan"); and (ii) except as specified below, there have been no alterations or modifications to any provision of the Standard-Form Plan.

The following provisions of the Standard-Form Plan have been altered or otherwise modified.

**[does not identify the creditors by name because of the number of creditors – page 1**
**Left Exhibit 3 blank as Debtor has no income**
**Changed provisions regarding discharge**
**Removed the pre-specified treatment of secured claims and described the classification and treatment more appropriate for this case.**
**Modified the effect of conversion to remove the reference to Chapter 13.**
**Added class for equity holders and treatment of same**

I declare that the foregoing is true and correct. Executed this 8th day of July, 2020.

 /s/ Stephen D. Finestone
Attorney for Debtor

/s/ Jason H. Rosell
Attorney for the Official Committee of
Unsecured Creditors

Combined Plan & Disclosure Statement of Munchery, Inc.

Case: 19-30232    Doc# 351    Filed: 07/08/20    Entered: 07/08/20 13:05:23    Page 13 of 24

**Exhibit 1A - Events That Led To Bankruptcy**

Much of the history of the Debtor has been discussed in various motions filed in the case, particularly the First Day Motions filed on the date the case was filed or shortly thereafter. In very general terms, the following is a brief history of the Debtor and the events that led to this bankruptcy filing.

1.      Munchery was founded in 2011. The original strategy for the business was to create a platform that enabled local professional chefs to make fresh meals at Munchery kitchens and to sell their products directly to customers through the Munchery website and mobile apps. The model later changed from this "marketplace" of chefs and consumers to a fully-integrated service in which Munchery eliminated the partnerships with local professional chefs and, instead, prepared, sold and delivered meals directly to customers. Customers would select fresh prepared meals, cooking kits, sides, desserts, and drinks from Munchery's daily menu on its website or mobile apps and Munchery would make and deliver the items directly to customers.

2.      Munchery's early focus was to develop a proprietary technology platform that could help operate and optimize the entire process of making and delivering fresh food directly to customers, including: front-end ecommerce, which allowed consumers to select, purchase and pay for meals through the company's website and native apps; the production system to quickly develop and launch new recipes, manage the supply chain, produce and plate the meals; the logistics and last-mile platform, which enabled the company to accurately and quickly pack items using modified hand scanners, distribute orders via a "hub and spoke" system where refrigerated trucks would transport and deliver orders; and, a driver app that assisted drivers in managing and routing their deliveries. Additionally, the company developed over three thousand meal recipes, including descriptions and photographs, that were shared among the four markets. Over the life of the business, the company invested significantly in its technology capabilities, believing that the company's ability to efficiently scale its operations and compete with others in the food delivery market would depend on the quality and depth of its technology capabilities.

3.      Munchery launched its service to consumers in May 2011. The company expanded its service to Seattle in July 2014, New York in March 2015, and Los Angeles in May 2015.

4.      When Munchery first launched, it was a purely transactional service, that is consumers paid for the products that they ordered. In mid-2016, the company transitioned to a membership-only model under which new customers had to become members and pay a monthly subscription fee in order to purchase items from Munchery. By mid-2017, the company transitioned again to a membership-optional model under which members would receive certain discounts and perks but non-members could also purchase from Munchery.

5.      Between 2013 and 2015, the company raised $120.7 million in three preferred equity financing rounds. In addition, Munchery secured $11.8 million in venture debt financing, including a secured term loan of $8.4 million from Comerica Bank ("Comerica") in December 2014 (the "Comerica Debt") and a secured growth capital loan of $3.4 million from TPVG in June 2016 (the "TPVG Debt") (Comerica and TPVG are referred to together as the "Senior Secured

Combined Plan & Disclosure Statement of Munchery, Inc.

<u>Creditors</u>"). The TPVG Debt was subordinated to the Comerica Debt. In addition, over 2017 and 2018, existing investors, and several new investors, participated in four convertible bridge debt financings: Spring 2017 for $12 million; Fall 2017 for $7.8 million; Winter 2018 for $1.5 million; and, $1.4 million in Spring 2018.

6.      During 2017 and 2018 the Debtor sought to improve the overall quality of the service in order to improve customer retention and engagement, bring efficiencies to operations in order to reduce costs and increase gross margins, reduce the company's cash consumption to increase its runway—and ultimately raise additional capital and return to growing the business.

7.      The company significantly reduced the cost of the headquarters operation. In mid-January 2017, the Debtor reduced the number of employees in our San Francisco headquarters to less than 50 people. It also hired additional senior people who had experience in managing food production facilities, streamlined operations, updated all processes, and integrated best practices for its operations.

8.      The Company significantly improved its operating metrics in 2017, including labor cost, food cost, food waste and gross margins—across all four markets. By the end of 2017, the Debtor had reduced EBITDA losses by 49% from 2016.  In addition, it significantly reduced fixed costs, including terminating or subleasing lease agreements for non-operational or non-essential properties in each of the four markets. Over 2017, Debtor reduced the number of leases from 23 to 13.

9.      In mid-2017, in an effort to be less reliant on revenue from our direct-to-consumer business, the Debtor sought to augment increase revenues and gross margins by: (1) producing products for third parties selling direct to consumers; and, (2) selling its branded finished products through other retail channels.  Despite identifying a potential customer and spending nine months in the process, the customer changed its focus. Munchery also launched its branded products at two COSTCO locations in September 2018 and expanded to 7 locations by the end of 2018, but it paused the COSTCO program in December 2018 to reduce costs as the program had not scaled sufficiently to achieve the target gross margins and was therefore losing money.

10.     Debtor also launched a line of Munchery branded sandwiches, entrees, salads, and breakfast items at AMAZON GO's first location in San Francisco in October 2018 and its second location in December 2018.  The AMAZON GO program was successful in terms of achieving revenue and gross margin targets and Debtor had hoped to expand the program until its bankruptcy filing.

11.     Because of its struggles, by the third fiscal quarter of 2017, the Board decided to market the company for sale. Despite significant effort and the retention of an outside professional, the company did not receive any offers.

12.     As part sale of its process, Munchery was introduced to a large regional grocery chain in the mid-Atlantic, which led to a wide scale intellectual property license of the Munchery technology platform (the "<u>IP License</u>") om June 2018. The company received $7.5 million, $3.4

million of which was used to pay down the Comerica Debt with the balance used to finance the operations of the company.

13. As a result of not finding a buyer, and in parallel with the consummation of the IP License, Munchery suspended operations outside San Francisco in May 2018. For the next three months Munchery focused on selling assets, terminating or subleasing leased properties, working with vendors who were owed money in those markets, and partnering with third parties interested in accessing the company's customer base. As a result of those efforts, the company generated approximately $1.6 million in proceeds, used to finance the operations of the company.

14. In the third and fourth quarters of 2018, however, the San Francisco business was down more than 30% year-over-year. Munchery believes it underestimated the impact of the news of the closures in Los Angeles, Seattle and New York to the San Francisco business. The Board again decided to market the company for sale and believed that the IP License transaction was a strong proof point of the value of Munchery's technology platform.

15. The Debtor reached out to fifty or more potential buyers but was again unable to find a buyer for the business, or potential new investors.

16. Up until the evening of Sunday January 21, 2019, management was negotiating with the Senior Secured Creditors and several investors to continue financing the operations of the company. It had identified a strategy to assign the lease of its San Francisco facility, sell its machinery and equipment to recover a portion of its $8 million investment in that facility, and use those proceeds to pay down a portion of the remaining debt to the Senior Secured Creditors, and finance the business to profitability. Debtor was also engaged with several potential buyers for the San Francisco facility in early December 2018. In early January 2019, Debtor received indications that several parties were working towards providing the company with a proposal. However, the company could not obtain an agreement from its Senior Secured Creditors or investors to continue funding the business through a longer period of time to sell the San Francisco facility while the business continued to operate.

17. As a result, the company announced the suspension of its operations on January 22, 2019. The entire workforce of 257 employees, including full-time and part-time workers in Los Angeles and San Francisco were laid off and were paid all accrued and unpaid wages and vacation through the end of that business day. The bankruptcy then followed on February 28, 2019.

18. James Beriker, the company's President & CEO from November 2016 through the filing of the chapter 11 bankruptcy on February 28, 2019, outlined what he believed to be the causes of Munchery's failure, which he set forth in his declaration in support of the company's first day filings as follows:

"Ultimately, the company suffered from a number of market and competitive forces and structural deficiencies that led to its inability to develop a long-term sustainable business

that could both grow and be profitable— and led to its inability to secure additional financing from existing or new investors and its subsequent closure in January 2019.

First, the company expanded too aggressively in its early years. The access to significant amounts of capital from leading Silicon Valley venture capital firms at high valuations and low-cost debt from banks and venture debt firms, combined with the perception that the on-demand food delivery market was expanding quickly and would be dominated by one or two brands-- as Uber had dominated the ridesharing market-- drove the company to aggressively invest in its business ahead of having a well-established and scalable business model. This resulted in over $125 million invested between 2011 and 2016 in technology development, property leases, construction of large food production facilities, expansion into new markets, and branding, partnerships and new user acquisition. The amount of capital raised and deployed, and the long-term commitments in fixed assets, made it impossible to achieve profitability, attract capital from existing or new investors, or find a buyer for the business.

Second, the business model relied heavily on the ability to attract new customers, which became more and more difficult as the market evolved. The cost of acquiring new customers increased significantly as other well-financed companies, such as Blue Apron, Plated, Home Chef and Hello Fresh, deployed significant budgets on search and social media platforms and leveraged aggressive promotions in order to grow their customer base. This significantly increased the cost of new customer acquisition and impaired the efficiency of these online advertising channels. The intensity of this competition, driven by the belief that user growth was essential to raising additional financing or executing a successful initial public offering, resulted in a deterioration of the entire market opportunity. Many companies, including Debtor, experienced a steady increase of customer-acquisition-cost, a decrease in customer retention and lifetime value, and increase in churn (or customer loss). The erosion of these fundamental operating metrics undermined the business models of many if not all startups seeking to develop long-term sustainable businesses in food delivery and impaired their ability to attract additional financing.

Third, as the market home delivery of prepared food expanded rapidly, particularly in the urban early-adopter markets in which Munchery operated, competition from well financed on-demand services such as Grub Hub, Seamless, Door Dash, Postmates, Caviar, and Uber Eats, increased significantly. These services were able to quickly bring popular restaurants onto their platforms, increasing choices for customers, and were able to invest heavily in brand marketing and user acquisition and drive adoption through free delivery and other incentives. The proliferation of these services made it difficult for Munchery to effectively differentiate its service and compete with their extensive meal choices, convenience and pricing.

Fourth, the costs associated with producing and delivering high quality meals every day, including the costs of labor, packaging, and fresh ingredients, increased beyond the

Combined Plan & Disclosure Statement of Munchery, Inc.

company's ability to raise prices while remaining competitive, suppressing its gross margins and impeding profitability.

Finally, the initial public offering of Blue Apron in June 2017, and the subsequent reporting of its financial and operational metrics, particularly its cost of customer acquisition, customer lifetime value, customer churn and retention rates, its advertising and marketing costs, the capital expense requirements of its business, the cost and complexity of its business operations, and the loss of approximate nearly 70% in enterprise value in its first year as a public company, had a material negative impact on access to financing for startups in the online food delivery business.

Like other startups in the fresh food delivery market, including early companies such as Spoon Rocket, Sprig, Maple, Bento, that ceased operations in March 2016, May 2017, May 2017, and January 2017, respectively, making and delivering freshly prepared food directly to consumers proved not to be a sustainable business model. " (Declaration of James Beriker in Support of Debtor's First Day Motions, paragraphs 35- 43).

Combined Plan & Disclosure Statement of Munchery, Inc.

**Exhibit 1B – Important Events During the Bankruptcy**

There have been numerous filings and developments since the filing of the case on February 28, 2019. The descriptions below are not intended to be exhaustive and a party is encouraged to review the case docket if the party wishes to have a more thorough list of what has transpired in the case.

**Employment matters:** Debtor sought and obtained the employment of general bankruptcy counsel (Finestone Hayes LLP), Financial Consultant (Armanino LLP) and Omni Management, Inc. (servicing agent, website hosting). Debtor also sought approval of an agreement with its CEO, James Beriker ("Beriker"), to manage its affairs during the Chapter 11 case. The motion received objections, most of which were resolved. The Court eventually approved a modified agreement with Beriker providing him with a reduced salary and the opportunity to earn additional amounts depending on the outcome of the case. Once the Committee was formed, it retained the firm of Pachulski Stang Ziehl & Jones LLP as its counsel. As discussed below, Armanino was later employed to assist Debtor in its effort to sell certain intellectual property assets.

**Postpetition Operations:** Debtor ceased regular operations prior to filing the bankruptcy case. Its immediate focus after filing was the assignment of its facility lease and the sale of related assets (the "Shaw Assets") located at 220 Shaw Road, South San Francisco, CA. Debtor entered into an agreement with Gate Gourmet ("Gate") for the purchase of the Shaw Assets and the assignment of the related lease. The Court approved certain procedures to afford another party to submit a bid superior to the Gate offer. Though other parties were interested, and Debtor and its counsel engaged with several parties, no one submitted an overbid. The assumption and assignment of the lease was approved without objection. The sale of the Shaw Assets to Gate was approved by the Court on April 23, 2019. The sale closed on April 30, 2019. Debtor received $5 million for the Shaw Assets and vacated the Shaw Road facility. Gate provided the landlord with a replacement security deposit and Debtor received the return of its security deposit of $300,000 and the release of a collateralized the Letter of Credit of an additional $300,000. Debtor then paid the entire Comerica claim of approximately $2.1 million and the DIP operating Loan. Debtor also set aside $350,000 as a reserve for paying PACA claims and additional amounts for Professional fees and other items.

**Litigation Matters:** Debtor was a defendant in a class action complaint filed in the U.S. District Court for the Northern District of California. The named plaintiffs are two former employees who were terminated along with the remainder of Debtor's employees on January 21, 2019, when it became clear the lenders and investors were no longer willing to fund operations. After Debtor filed this case, the plaintiffs filed a nearly identical class action case in this Court. Plaintiffs asserted on their own behalf and on behalf of similarly situated individuals, that Debtor violated the W.A.R.N. act and its California equivalent by letting the employees go without 60 days' notice of the termination of their employment. Debtor filed a motion to dismiss the class action complaint, which the Court granted: however, it granted the Plaintiffs relief from stay to resume the District Court Action. As discussed below, the class action dispute was eventually settled, which resolution is included in this Plan.

Combined Plan & Disclosure Statement of Munchery, Inc.

**Additional Asset Sales:** After the sale of the Shaw Road Assets, the most significant remaining asset were:

1) Debtor's intellectual property (the "IP"). The IP consists of the software applications described above as the "Software Assets" and other assets generally described as: customer data, content, and trademark assets including: (a) the customer data, including all email and other contact information, transaction history, and customer ratings and reviews; (b) the historical transactional data; (c) the recipe database, including ingredients, nutritional information, preparation instructions, descriptions, and photographs; and (d) the tradename, trademarks, domain names, all written content, videos, and photography assets developed by or owned by Munchery to support the business or the brand (collectively, the "Data and Content Assets"); and

2) Various equipment and machinery excluded from the Shaw Assets (the "Misc. Assets").

Beriker managed the sale of the Misc. Assets and obtained proceeds of $103,315. In order to sell Software Assets and the Data and Content Assets, and based upon input from TPVG and the Committee, the Debtor retained Armanino to head up its IP sale effort. Armanino specializes in providing support to companies that are winding down their operations and marketing and selling their IP and other assets. Armanino and Munchery reached out to over 100 parties attempting to generate interest in the IP, or parts of it. Munchery and Armanino kept a "deal tracker" spreadsheet that was shared with the Committee and TPVG on a regular basis. And, the parties held frequent update calls with the Committee and TPGV. Debtor and Armanino had many calls with potential buyers, provided material in support of the sale of the IP, and in some cases met with potential buyers and put on numerous demonstrations of the software for interested parties. Ultimately, the response was not acceptable to Debtor, the Committee and TPVG, and Debtor terminated the sale process.

**Class Action Litigation:** The class action plaintiffs filed a motion in the District Court seeking certification of the class. Prior to the hearing on the motion, the Plaintiffs, along with Debtor, TPVG and the Committee agreed to mediate the pending disputes and see if the parties could resolve the pending issues in the case and move toward a plan.

**PACA Claims:** Various creditors asserted claims under the Perishable Agricultural Commodities Act ("PACA") against the Debtor. Pursuant to PACA, such creditors (the "PACA Claimants") asserted a right to Debtor's assets, including the proceeds of the sale of the Shaw Assets, senior to all claims. Consequently, $350,000 was set aside from the Shaw Asset sale to cover all potential PACA claims. Debtor and the Committee have now settled all PACA claims and all PACA Claimants have been paid on account of their claims. A total of $166,108 of the $350,000 PACA reserve and is now available to fund the Plan.

**The Committee Litigation:** The Committee filed an adversary proceeding against TPVG (case no. 19-03048) (the "Challenge Litigation") in which the Committee challenged the validity and priority of TPVG's security interest in Debtor's assets. The Challenge Litigation was stayed while the parties sought a global resolution of the issues in the Chapter 11 case. As part of the RSA (defined below), the Challenge Litigation will be dismissed with prejudice.

**The Mediation:** Debtor, the Committee, TPVG and the Class Plaintiffs attended a mediation in October 2019, with the Hon. Roger L. Efremsky serving as mediator. The parties did not reach agreement on the day of the mediation but continued working with Judge Efremsky and were eventually able to enter into a Restructuring Support Agreement (the "RSA"). The Court approved the RSA on April 10, 2020. The RSA provided the framework for this Plan and the treatment of TPVG, the Committee and the Class Plaintiffs and the bankruptcy estate's retention of funds.

**Sale of the Data and Content Assets:** Debtor and the Committee anticipate Bankruptcy Court approval of the sale of the Data and Content Assets to Rolliyo, Inc. prior to confirmation of the Plan. Consummation of the sale will result in payment of $40,000 to TPVG and $20,000 to the Debtor's estate, the latter payment being made through an interest-bearing promissory note due to the estate in a single payment 6 months after the closing of the sale of assets to Rolliyo, Inc.

Combined Plan & Disclosure Statement of Munchery, Inc.

**Exhibit 2 - What Creditors Would Receive if the Case Were Converted to a Chapter 7**

Rather than utilize the tables that come with the Court's form plan, Debtor and the Committee believe the following explanation provides creditors with adequate information regarding what would occur if the case were converted to Chapter 7:

Current funds on hand are estimated at $2,125,000. If the case were converted, the terms of the RSA would no longer be binding on the parties. As such, TPVG could assert its right to all the funds and assets in the estate, which total far less than TPVG's approximate claim of $3.4 million. A Chapter 7 trustee could assume the Challenge Litigation, but Debtor and the Committee do not believe that a Chapter 7 trustee could achieve a better outcome than the terms of the RSA and this Plan. Rather, Debtor and the Committee think it likely that a Chapter 7 trustee would attempt to negotiate a much more modest carve-out of TPVG's security interest, sufficient perhaps to pay some administrative claims and a portion of the priority claims. As such, the case would be administratively insolvent. The unsecured creditors would receive nothing, the Class Plaintiffs (Class 2A) would likely receive far less than is proposed in the Plan.

It is possible that a Chapter 7 trustee could litigate the Challenge Litigation to completion and succeed, in which case TPVG would be an unsecured creditor and there would be more funds available to unsecured creditors. Debtor and the Committee believe the outcome of the litigation is highly in doubt and unlikely to result in a complete victory for the Chapter 7 trustee. This uncertainty would not justify the trustee and her counsel expending the time and money to fully litigate the matter and would likely lead to a settlement that would be less beneficial to creditors than the terms of the Plan. With respect to the IP, Debtor and the Committee believe it likely that a Chapter 7 trustee would be unable to structure a deal similar to the RSA and would abandon the assets with no recovery to the creditors. Of course, a Chapter 7 proceeding would also engender significant delay, with any distribution likely to occur at least a year or more from conversion of the case and would also result in additional significant diminution of the value of any remaining assets.

**Exhibit 3 - Income and Expenses**

The Debtor is no longer operating, and any income and expense analysis is not applicable.

**Exhibit 4 - Feasibility Analysis**

Can the Debtor Make the Effective Day Payments?

|  | Amount |
|---|---|
| Total Cash on Hand (estimated) | $2,160,000 |
| Effective Day Payments [SUBTRACT] | |
|    Unclassified Claims | |
|    Administrative Expense Claims | $454,211 |
|    Priority Claims | $173,630 |
|    U.S. Trustee Fees | $1,300 |
| NET CASH AFTER EFFECTIVE DAY PAYMENTS | $1,530,859 |

Can the Debtor Make the Plan Payments?

|  | Year 1 |  |  |  |  |
|---|---|---|---|---|---|
| Beginning Cash | $1,530,859 | | | | |
|  | | | | | |
| NET CASH | | | | | |
| § 507(a) Payments | Paid above | | | | |
| Class 1 Payments | $1,000,000 | | | | |
| Class 2a Payments | $400,000 | | | | |
| Class 2b Payments | $120,000 | | | | |
|  | | | | | |
| TOTAL PLAN PAYMENTS | | | | | |
| NET CASH AFTER PLAN PAYMENTS | $10,859 | | | | |

Combined Plan & Disclosure Statement of Munchery, Inc.